# FILED

**October 19, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

IN THE COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE


VANTAGE TECHNOLOGY, LLC,          ) C/A NO. 03A01-9810-CH-00333
)

       Plaintiff-Appellant, )
)
)
)
)

v.                        )    APPEAL AS OF RIGHT FROM THE
) HAMBLEN COUNTY CHANCERY COURT
)
)
)
)

MARK CROSS,            )
) HONORABLE THOMAS R. FRIERSON,

II
Defendant-Appellee.  ) CHANCELLOR


For Appellant                    For Appellee

J. FORD LITTLE                   H. SCOTT REAMS
MICHAEL J. KING                  Taylor, Reams,
Woolf, McClane, Bright,            Tilson & Harrison
  Allen & Carpenter, PLLC        Morristown, Tennessee
Knoxville, Tennessee


# O P I N I O N


REVERSED IN PART
AFFIRMED IN PART
REMANDED                                    Susano, J.

Vantage Technology, LLC ("Vantage") filed this suit against its former employee, Mark Cross ("Cross"), seeking injunctive relief and damages for breach of a non-competition covenant. Following a bench trial, the Chancellor found that the covenant was unreasonable and unenforceable. Vantage appeals, raising the following issues for our consideration:

1. Did the trial court err in finding that the non-competition covenant was unreasonable and unenforceable?

2. Did the trial court err in denying Vantage's motion to amend its pleadings to conform to the evidence?

Appellee Cross raises the additional issue of whether the trial court erred in applying Tennessee law rather than Illinois law.

I. *Facts and Procedural History*

A. Vantage's Business

Vantage's business involves the rendering of a service to ophthalmologists in a hospital setting. To best understand the facts of this case, it is necessary to have an elementary grasp of cataract surgery logistics, especially as it relates to the relationships of the parties involved. When an ophthalmologist determines that a patient needs surgery to remove cataracts, the physician must then choose, from among the hospitals at which the doctor has privileges, the facility

at which the surgery is to be performed.  Because physicians often prefer to perform surgery with certain equipment, supplies, and instruments, the presence or absence of these accouterments at a particular hospital is often the determining factor in the surgeon's choice of location.  Thus, hospitals, in competition with one another for facility usage fees, often seek to attract surgeons by offering the tools that surgeons prefer.  While larger hospitals are generally able to provide these tools in-house, rural hospitals must often obtain them from third parties.  These third parties, sometimes referred to as "mobile service providers", transport the necessary equipment to the hospital when a surgeon is scheduled to perform cataract surgery.  These mobile service providers are driven by the same incentives as are the hospitals — to provide the equipment, supplies, instruments and services that surgeons prefer.

Vantage, as one of these mobile service providers, employs technicians to transport the required materials to rural hospitals and to assist the physicians during surgery. Cross is a former Vantage technician.  For the reasons outlined above, Vantage has an interest in initiating, developing, and sustaining relationships not only with hospitals, but also with the physicians performing cataract surgery at the hospitals.  To initiate such relationships, Vantage utilizes direct-mailings or face-to-face demonstrations to sell its services to hospitals.  Vantage

delegates to the technicians the ongoing task of developing and sustaining these relationships because a technician is the primary liaison between Vantage and the doctors and hospitals. In furtherance of the goal of relationship-building, Vantage encourages its technicians to use entertainment expense accounts to purchase meals or gifts for physicians and other surgical staff.

Another method that Vantage employs to build and strengthen relationships is the collection and recordation of surgeon preferences. These "doctor diaries" are used to record surgeons' preferences for machine settings, supplies, and instruments. This information is initially gathered and logged in by a Vantage salesperson. When a technician is assigned to a particular surgeon, the technician refers to the diary to determine what equipment to bring and how to set up the machine, instruments and supplies. The doctor diaries also include personal information about the doctor such as hobbies and interests. Part of the technician's responsibility is to record in the doctor diaries any change in surgeon preferences or problems encountered during surgery. The technicians are also required to report growth opportunities of which they become aware during the performance of their duties.

The primary piece of equipment that Vantage provides to hospitals is a phacoemulsification machine. This machine

is used to break cataracts into pieces and remove the pieces through irrigation and aspiration. Once the cataract is removed, the surgeon implants an artificial lens into the eye. Surgery with the machine enables the surgeon to utilize a much smaller incision which, in turn, allows an easier and shorter recuperation time for the patient. Additionally, the machines allow surgeons to perform more cataract surgeries in less time.

In addition to providing the machine, Vantage also provides supplies, instruments, and technician services. The technician's pre-surgery responsibilities include transportation of the equipment, setting up the machine's parameters according to the surgeon's preferences, tuning the hand piece, "breaking out" the supplies and instruments, and preparing the room for surgery. During surgery, the technician stays by the machine and changes the machine's modes by pressing buttons according to the surgeon's instructions. The surgeon, not the technician, places the machine tip to the eye and otherwise operates the machine during surgery through the use of foot pedals.

No medical training or education is required for technicians, nor do technicians need to be licensed. One can be trained to operate the machine in a single day. A trained technician can set up the parameter preferences in approximately 15 seconds. A physician can perform surgery without a technician in the room. Still, a technician's

responsibilities require a degree of familiarity with the machine.

From October, 1994, to August, 1996, Vantage, with 15 to 18 employees, provided mobile services to 70 to 100 hospitals in eight states, including Tennessee. Four hospitals in Tennessee are relevant to this case: Fort Sanders-Loudon Medical Center ("Fort Sanders-Loudon") in Loudon; Lakeway Regional Hospital ("Lakeway") in Morristown; LaFollette Medical Center ("LaFollette") in LaFollette; and Fort Sanders-Sevierville Medical Center ("Fort Sanders-Sevierville") in Sevierville.

Vantage provided mobile services to Fort Sanders-Loudon under an exclusive contract from August 15, 1995, to August 14, 1996. After termination of the contract, Vantage provided services at least once more on September 4, 1996. The primary ophthalmologist performing cataract surgery at Fort Sanders-Loudon was Dr. Subba Rao Gollamudi.

Vantage provided mobile services to Lakeway under a one-year, non-exclusive contract beginning on October 1, 1995. Dr. Gollamudi was also the primary ophthalmologist at Lakeway.

Vantage provided mobile services to LaFollette on one occasion in 1994. Because LaFollette was, at that time, satisfied with its own machine and because LaFollette and

Vantage could not come to an agreement regarding price, LaFollette did not become a Vantage customer.

Vantage first contacted Fort Sanders-Sevierville in April, 1998, two months prior to trial.

B. Cross' Employment with and Departure from Vantage

Cross began employment with Vantage as a technician in October, 1994. His qualifications for the position included a bachelor's of science degree in administrative management and experience from a variety of jobs. He had no experience, training or education directly relevant to the operation of phacoemulsification machines.

In January, 1995, Cross signed a covenant not to compete, which provides as follows:

[d]uring the term hereof and for a period of three years thereafter, the Employee shall not compete, directly or indirectly, with the Company interfere with, disrupt or attempt to disrupt the relationship, contractual or otherwise, between the Company and any customer, client, supplier, consultant or employees of the Company, including, without limitation, employing or being an investor (representing more than a 5% equity interest) in, or officer, director or consultant to, any person or entity which employs any former key or technical employee whose employment with the Company was terminated after the date which is one year prior to the date of termination of the Employee's employment therewith. An activity competitive with an activity engaged in by the Company shall mean performing services (whether as an employee, officer, consultant, director, partner or sole proprietor) for any person or entity engaged in the business then engaged in by the Company, within 50 miles of any Company office or Company's client location.

The agreement also provides that:

[i]t is the desire and intent of the parties that the provisions of this Section shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular portion of this Section shall be adjudicated to be invalid or unenforceable, this Section shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of this Section in the particular jurisdiction in which such adjudication is made.

Vantage taught Cross how to perform his duties as a phacoemulsification technician. Cross spent his first month of employment with Vantage in 241.5 hours of training. This training primarily consisted of observing a more senior Vantage technician during approximately 70 cataract surgeries. Cross also watched videos and read manuals. During the course of his employment, Cross attended monthly meetings and also went to one "wet lab" where he performed a cataract surgery on a pig's eye. Most of Cross' training pertained to two models of a machine manufactured by Alcon and one model manufactured by Storz.

After Cross' initial training, he began to provide services to hospitals without the supervision of another Vantage technician. Cross relied on the doctor diaries to ascertain the preferences of the doctors with whom he worked.

In addition to the doctor diaries, Cross received schedules which included not only his own itinerary, but also the names of the hospitals and doctors for whom his fellow technicians would be working. Cross testified that, after referring to the schedules to determine where and with whom he was to work, he discarded the schedules without having ascertained the identities of any other Vantage customers. Cross had limited knowledge of Vantage's pricing and other terms of Vantage's contracts with hospitals.

During his employment with Vantage, Cross serviced 49 hospitals in at least six states. Two of the hospitals Cross serviced were Fort Sanders-Loudon and Lakeway. At first, Vantage dispatched several different technicians to service these two hospitals. By the summer of 1996, however, Cross was the Vantage technician in the majority of the surgeries performed at these two hospitals, and had developed a strong relationship with Dr. Gollamudi.

In the summer of 1996, Vantage informed Cross that it wanted him to service hospitals in Ohio rather Tennessee. Cross and Dr. Gollamudi began to discuss the possibility of Cross working as a technician for Dr. Gollamudi independent of Vantage, using an Allergan Prestige machine which Dr. Gollamudi preferred over the machines supplied by Vantage. Vantage never trained Cross on an Allergan Prestige machine.

Around this time, Cross learned from Dr. Gollamudi that LaFollette was experiencing problems with its phacoemulsification machine to the point of having to postpone and cancel surgeries.  The Operating Room Director at LaFollette testified that Cross met her on August 13, 1996, to discuss the providing of mobile services.  Cross did not mention that he was a Vantage employee.  On August 15, 1996, Cross gave Vantage his two weeks notice.  Cross faxed a price quote to LaFollette on August 16, 1996.  On August 19, 1996, Dr. Gollamudi secured $40,000 from a bank and then loaned the money to Cross to finance the start-up of Cross' business, Southern Surgical Support.  Cross used most of the money to purchase a refurbished Allergan Prestige machine which he ordered on August 29, 1996, his last day as a Vantage employee.  Cross received the machine on September 2, 1996, and an Allergan representative, in one day, instructed him in its operation.

Cross rendered his first service through his new business on September 10, 1996, at LaFollette.  With the help of Dr. Gollamudi's influence, Cross began servicing Lakeway sometime within the next month and Fort Sanders-Loudon in October, 1996.  In November, Dr. Gollamudi introduced Cross to a partner who performed surgery at Fort Sanders-Sevierville.  Cross began servicing Fort Sanders-Sevierville in January, 1997.

Vantage filed suit on May 16, 1997, alleging that Cross had breached a valid and enforceable covenant not to compete.  The trial court, finding the covenant unreasonable and unenforceable, rendered judgment in favor of Cross. Vantage then appealed.

## II.  *Standard of Review*

In this non-jury case, our review is *de novo* upon the record, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates otherwise.  Rule 13(d), T.R.A.P.; *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995).  The trial court's conclusions of law, however, are accorded no such presumption.  *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

Our *de novo* review is subject to the well-established principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal.  *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn.App. 1995); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn.App. 1991).

III. *Analysis*


A. Non-Competition Covenant


Covenants not to compete, because they are in restraint of trade, are disfavored in Tennessee. *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984). As such, they are construed strictly in favor of the employee. *Id*. However, when the restrictions are reasonable under the circumstances, such covenants are enforceable. *Id*. The factors that are relevant in determining whether a covenant not to compete is reasonable include "the consideration supporting the agreements; the threatened danger to the employer in the absence of such an agreement; the economic hardship imposed on the employee by such a covenant; and whether or not such a covenant should be inimical to public interest." *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966).


The first factor, consideration, is not an issue on appeal. In balancing the other three factors, a threshold question is whether the employer has a legitimate business interest, i.e., one that is properly protectable by a non-competition covenant. *See Hasty*, 671 S.W.2d at 473.


Several principles guide the determination of

whether an employer has a business interest properly protectable by a non-competition covenant.  Because an employer may not restrain ordinary competition, it must show the existence of special facts over and above ordinary competition.  *Id*.  These facts must be such that without the covenant, the employee would gain an unfair advantage in future competition with the employer.  *Id*.  Considerations in determining whether an employee would have such an unfair advantage include (1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer.  *Id*.  These considerations may operate individually or in tandem to give rise to a properly protectable business interest.  *See, e.g., AmeriGas Propane, Inc. v. Crook*, 844 F.Supp. 379 (M.D. Tenn. 1993); *Flying Colors of Nashville, Inc. v. Keyt*, C/A No. 01A01-9103-CH-00088, 1991 WL 153198 (Tenn.App. M.S., filed August 14, 1991).

1. Specialized Training

An employer does not have a protectable interest in the *general* knowledge and skill of an employee.  *Hasty*, 671 S.W.2d at 473.  This is not only true of knowledge and skill

brought into the employment relationship, but also true as to that acquired during the employment relationship, even if the employee obtained such general knowledge and skill through expensive training. *See* **Hasty**, 671 S.W.2d at 473 ("general knowledge and skill appertain exclusively to the employee, even if acquired with expensive training and thus does not constitute a protectible [sic] interest of the employer").

In contrast, an employer may have a protectable interest in the *unique* knowledge and skill that an employee receives through special training by his employer, at least when such training is present along with other factors tending to show a protectable interest. *Id; **Selox, Inc. v. Ford***, 675 S.W.2d 474, 476 (Tenn. 1984) ("A line must be drawn between the general skills and knowledge of the trade and information that is peculiar to the employer's business.") (quoting Restatement (Second) of Contracts § 188 cmt. g (1981)). *See also **Flying Colors of Nashville***, 1991 WL 153198 at *5 (holding that training in specialized techniques and processes of paint-mixing, together with a special relationship with the employer's customers, gives rise to a properly protectable interest).

Thus, whether an employer has a protectable interest in its investment in training an employee depends on whether the skill acquired as a result of that training is sufficiently special as to make a competing use of it by the

employee unfair.

2. Trade Secrets and Confidential Information

An employer has a legitimate business interest in keeping its former employees from using the former employer's trade or business secrets or other confidential information in competition against the former employer. *Hasty*, 671 S.W.2d at 473. A trade secret is defined as any secret "formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it." *Hickory Specialties, Inc. v. B & L Labs., Inc.*, 592 S.W.2d 583, 586 (Tenn.App. 1979) (quoting *Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp.*, 255 F.Supp. 645, 653 (E.D. Mich. 1966)). The subject matter of a trade secret must be secret and not well known or easily ascertainable. *Hickory Specialties*, 592 S.W.2d at 587.

What constitutes "confidential information" is somewhat less clear. In *Heyer-Jordan & Assocs., Inc. v. Jordan*, 801 S.W.2d 814 (Tenn.App. 1990), we held that the identities of the employer's customers did not amount to "confidential business information" within the meaning of the employment agreement because such information was generally available in the trade. We reasoned that "confidential information" is analogous to "trade secret" and that, because customer identities are not secret, they cannot be considered

confidential.  *See also* **Amarr Co. v. Depew**, C/A No. 03A01-9511-CH-00412, 1996 WL 600330, *4-*5 (Tenn.App. W.S., filed October 16, 1996) (holding that customer lists, customer credit information, pricing information, and profit and loss statements did not constitute confidential information because such information is easily available from sources other than the employer).

### 3. Special Customer Relationships

An employer may also have a legitimate protectable interest in the relationships between its employees and its customers.  *See* **Hasty**, 671 S.W.2d at 473.  It is often the case that the customer associates the employer's business with the employee due to the employee's repeated contacts with the customer.  The employee in essence becomes "the face" of the employer.  This relationship is based on the employer's goodwill.  The employee's role in this relationship is merely that of the employer's agent.  In this role, the employee is made privy to certain information that is personal, if not technically confidential.  Because this relationship arises out of the employer's goodwill, the employer has a legitimate interest in keeping the employee from using this relationship, or the information that flows through it, for his own benefit. This is especially true if this special relationship exists along with the elements of confidential information and/or specialized training.  For illustrations of this principle,

see ***AmeriGas Propane, Inc. v. Crook***, 844 F.Supp. 379, 386 (M.D.Tenn. 1993); ***Ramsey v. Mutual Supply Co.***, 427 S.W.2d 849, 852 (Tenn.App. 1968); ***Federated Mut. Implement and Hardware Ins. Co. v. Anderson***, 351 S.W.2d 411, 415 (Tenn.App. 1961); ***Arkansas Dailies, Inc. v. Dan***, 260 S.W.2d 200, 204-05 (Tenn.App. 1953); ***Powell v. McDonnell Ins., Inc.***, C/A No. 02A01-9608-CH-00176, 1997 WL 589232, *5 (Tenn.App. W.S., filed September 24, 1997); ***Flying Colors of Nashville, Inc. v. Keyt***, C/A No. 01A01-9103-CH-00088, 1991 WL 153198, *5 (Tenn.App. M.S., filed August 14, 1991).

## 4. Application

Vantage argues on appeal that it has a legitimate business interest in all of the above categories, i.e., specialized training, confidential information, and special customer relationships.  The trial court concluded that Cross' training was "not so unique or specialized as to justify a covenant not to compete for its protection...."  It also held that Vantage had no legitimate business interest in the customer lists, pricing levels, and doctor diaries because such information does not constitute confidential information. Finally, the trial court found that Vantage does not have a protectable interest in the relationship arising out of Cross' direct and repeated contacts with Vantage's customers because the hospitals are primarily concerned with quality and price rather than developing relationships.

While the relevant factors mentioned above must each be analyzed in isolation, they must also be analyzed in tandem. When the facts of the instant case are analyzed in the latter manner, we find and hold that Vantage has established a legitimate business interest that can be properly protected by a covenant not to compete.

Cross' first month of employment was devoted to training. His first 241.5 hours on the job were primarily spent in observation of approximately 70 surgeries. After the initial training period ended, he attended monthly meetings. In addition to this training, the relationships between Vantage and the hospitals and surgeons were initiated by Vantage and were built on the foundation of Vantage's goodwill. Any contribution of Cross to the development and sustenance of these relationships was accomplished in Cross' role as an agent of Vantage. In performance of this role, Cross was made privy to surgeon preferences. He had a degree of knowledge of Vantage's other customers and the prices it charged for Cross' services. Additionally, it was in this role as Vantage technician that Cross' relationship with Dr. Gollamudi was initiated and developed. This relationship, as well as the information that flowed through it, gives Cross an unfair advantage in competition against his former employer because it comes at the expense of his former employer. When this special relationship is coupled with the training Cross received from Vantage and the confidential information he

received while in its employ, the totality of all of this amounts to a legitimate business interest properly protectable by a covenant not to compete.[0]  To the extent the trial court found otherwise, we find and hold that the evidence preponderates against such a finding.

Finding that Vantage has established a protectable interest, however, does not end our inquiry.  According to the *Allright* factors, the threatened danger to Vantage's protectable interest in the absence of a non-competition covenant must be balanced against the economic hardship imposed on Cross by such a covenant.  The public interest must also be considered.  *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966).

The trial court, apparently relying on its previous findings of fact, found that "[t]he economic hardship imposed upon Cross by such a covenant greatly outweighs the threatened danger to Vantage in the absence of such an agreement."  For the reasons articulated above, we disagree.  If the covenant is not enforced, Vantage stands to lose its investment in training Cross and its investment in the development of customer relationships as well as the effort expended in gathering information concerning surgeon preferences.  If the covenant is enforced, Cross merely loses that which does not

belong to him.

The relevant considerations bearing on the public interest do not preclude enforcement of the non-competition covenant. Any restraint on competition has the potential to increase the cost of what are already expensive health care services. On the other hand, not enforcing the covenant would allow Cross to unfairly use the benefits bestowed upon him by his employer and may result in a disincentive to Vantage to properly train and inform its employees. Accordingly, we find that the public interest considerations do not militate against enforcement of the covenant. We conclude that the threatened danger to Vantage in the absence of such enforcement outweighs the economic hardship imposed upon Cross by enforcement of the non-competition covenant.

To be enforceable, a covenant not to compete must clear one final hurdle. The scope of a covenant not to compete must be reasonable in that "the time and territorial limits involved must be no greater than is necessary to protect the business interests of the employer." *Allright Auto Parks*, 409 S.W.2d at 363. If the scope of the covenant is reasonable as written, it will be enforced as written. If the scope is unnecessarily burdensome to the employee, however, it will be enforced only "to the extent that [it is] reasonably necessary to protect the employer's interest ' without imposing undue hardship on the employee when the

public interest is not adversely affected.'" *Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 37 (Tenn. 1984) (quoting in part *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 370 (Iowa 1971)). Hence, a court may modify an unreasonable covenant so as to render it reasonable. To protect against employers drafting overly broad language secure in the knowledge that the sole sanction would be modification to the maximum extent allowed, courts will hold the entire covenant invalid if credible evidence supports a finding that the covenant is deliberately unreasonable and oppressive. *Central Adjustment Bureau*, 678 S.W.2d at 37. With respect to territorial limitations, covenants that embrace an area in which the employee never performed services are unreasonable unless the employee possesses knowledge of the employer's trade secrets. *Allright Auto Parks*, 409 S.W.2d at 364.

The covenant at issue in the instant case is rather inartfully drawn. It essentially prohibits Cross from competing with Vantage for three years "within 50 miles of any Company office or Company's client location." Vantage's rationale for the 50-mile restriction is that surgeons often serve numerous hospitals within 50 miles of each other, and, because surgeons are so influential in the hospitals' choice of mobile service provider, a provider's relationship with a surgeon can translate into relationships with surrounding hospitals.

We find the 50-mile restriction to be a reasonable geographical scope with respect to the locations of Vantage's customer-hospitals in which Cross served as technician for Vantage. Vantage's asserted rationale, however, does not explain the need for protection of a 50-mile area surrounding Vantage's offices. Nor does it explain the need for protection in areas near hospitals in which Cross never performed services. The evidence does not suggest that Vantage deliberately drafted the covenant to be unreasonable or oppressive. Accordingly, we modify the covenant to prohibit Cross from competing with Vantage within 50 miles of any Vantage customer location in which Cross performed services while a Vantage technician.

There are at least two other problems with the subject covenant. First, it does not expressly state whether " within 50 miles" is intended to refer to a radius or driving distance. Second, the covenant does not state whether the " Company's client location" refers to hospitals which were at one time clients or which were clients at the time of Cross' termination. Because the agreement is ambiguous, and because we are to construe covenants not to compete favorably to the employee, we find and hold that the area of restriction is 50 miles as determined by the shortest driving distance. Additionally, we hold that the covenant applies only to those hospitals in which Vantage was regularly providing services at

the time of Cross' termination.

With respect to the period of restriction, we hold that three years is reasonable. *See* **Matthews v. Barnes**, 293 S.W. 993, 993, 996 (Tenn. 1927) (five-year covenant held reasonable); **Ramsey v. Mutual Supply Co.**, 427 S.W.2d 849, 852-53 (Tenn.App. 1968) (five-year covenant held reasonable); **Arkansas Dailies, Inc. v. Dan**, 260 S.W.2d 200, 205 (Tenn.App. 1953) (three-year covenant held reasonable); **Mike Glynn & Son, Inc. v. Schang**, 1990 WL 7449, *1, *4 (Tenn.App. W.S., filed February 5, 1990) (three-year covenant held reasonable).

In sum, we hold the following: (1) that Vantage has established that it has a legitimate, protectable interest; (2) that the threatened danger to this interest in the absence of a non-competition covenant outweighs the economic hardship imposed on Cross resulting from enforcement of the covenant; (3) that the three-year time period for which Cross is prohibited from competing with Vantage is reasonable; and (4) that the geographical scope of the covenant is modified so that Cross is prohibited from competing with Vantage within 50 miles, shortest driving distance, of any hospital in which Vantage was regularly providing services at the time of Cross' termination, but only with respect to those hospitals in which Cross performed services while a Vantage technician.

On remand, the trial court must determine, according

to the parameters we have outlined above, whether and to what extent Cross has violated his non-competition covenant.  If Cross has violated his covenant, the trial court must determine the extent of injunctive relief and/or damages to which Vantage is entitled.

B. Motion to Amend to Conform to the Evidence

The second issue Vantage raises on appeal is whether the trial court erred in denying Vantage's motion to amend its pleadings to conform to the evidence.  On May 16, 1997, Vantage filed suit alleging breach of the covenant not to compete.  Vantage did not assert breach of duty of loyalty as a cause of action.  On June 30, 1998, the parties proceeded to the first day of trial.  Vantage examined, and Cross cross-examined, four witnesses.  The court then adjourned until July 13, 1998.  On July 7, 1998, Vantage filed a motion to amend the pleadings to conform to the evidence seeking to add a breach of duty of loyalty cause of action.  The court heard the motion on July 13, 1998, and denied it, finding that the issue had not been tried by express or implied consent and that an amendment at that time would result in prejudice to Cross.

In determining whether to grant or deny a motion to amend the pleadings to conform to the evidence[2], "the most important question is whether the new issues were tried by the

parties' express or implied consent and whether the defendant '

would be prejudiced by the implied amendment, i.e., whether he

had a fair opportunity to defend and whether he could offer

any additional evidence if the case were to be retried on a

different theory.'" *Zack Cheek Builders, Inc. v. McLeod*, 597

S.W.2d 888, 891 (Tenn. 1980) (quoting *Browning Debenture*

*Holders' Comm. v. Dasa Corp.*, 560 F.2d 1078, 1086 (2d Cir.

1977).  Presentation of evidence that is relevant to both a

pled issue and a non-pled issue does not establish trial of

the non-pled issue by implied consent.  *Hiller v. Hailey*, 915

S.W.2d 800, 805 (Tenn.App. 1995).  Whether the issue has been

tried by implied consent is a decision resting within the

sound discretion of the trial court, and, as such, it cannot

be disturbed on appeal absent an abuse of discretion.  *Zack*

*Cheek Builders*, 597 S.W.2d at 891.


Here, Vantage seeks to amend the pleadings to

include a breach of duty of loyalty claim based on certain

evidence elicited on the first day of trial.  Vantage asserts

that it did not learn until the first day of trial that Cross

personally solicited LaFollette two days before giving his

notice of termination to Vantage.  Vantage contends that this

evidence is relevant only to a breach of duty of loyalty

claim.  It also asserts that this issue was tried by implied

consent because Cross' attorney examined two witnesses

regarding the timing of Cross' solicitation of LaFollette for

himself.  Cross responds with the argument that the facts

surrounding the timing of his personal solicitation of clients is relevant to the breach of the non-competition covenant, especially as it relates to the calculation of damages should he be found to be in violation of the covenant. Thus, Cross argues that he did not expressly or impliedly try the breach of duty of loyalty claim, and that the amendment after witnesses have been dismissed would be prejudicial to his case.

On the second day of trial, after denial of the motion to amend, counsel for Vantage questioned Cross about when Cross established his own business. In response to an objection based on relevancy, *i.e.*, that the question was outside the scope of the pleadings, counsel for Vantage stated that "[i]f the gentleman is out competing directly with his employer during the actual employment with the employer, that's certainly relevant to the facts of this case." We agree with Cross and Vantage's counsel that the evidence surrounding the timing of Cross' solicitation of LaFollette is relevant to the alleged violation of the non-competition covenant. Moreover, by the time the motion was filed, four witnesses had been examined and dismissed. Granting the motion would have resulted in Cross not being given fair notice or an opportunity to present evidence relevant to a cause of action alleging breach of duty of loyalty. Accordingly, we find that the trial court did not abuse its discretion in denying Vantage's motion to amend its pleadings to conform to the evidence.

## C. Choice of Law

Cross raises as an issue on appeal whether the trial court erred in applying Tennessee law rather than Illinois law in determining the enforceability of the covenant not to compete. The basis for the trial court's decision regarding choice of law is paragraph 2(b) of the agreement not to compete signed by Cross. This paragraph provides as follows:

[i]t is the desire and intent of the parties that the provisions of this Section shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular portion of this Section shall be adjudicated to be invalid or unenforceable, this Section shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of this Section in the particular jurisdiction in which such adjudication is made.

The goal of contract interpretation is to ascertain the intent of the parties according to the usual, natural, and ordinary meaning of the words used by the parties. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Any ambiguity is to be construed against the drafter. *Spiegel v. Thomas, Mann & Smith, P.C.*, 811 S.W.2d 528, 531 (Tenn. 1991). Contracts must be construed, as far as is reasonable, so as to give effect to every term. *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn.App. 1996). Interpretation of a contract, being a matter of law, is subject to *de novo* review with no presumption of correctness. *Guiliano v. Cleo*, 995 S.W.2d 88,

95 (Tenn. 1999); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

Tennessee follows the rule of *lex loci contractus*. This rule provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent. *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973).

If the parties manifest an intent to instead apply the laws of another jurisdiction, then that intent will be honored provided certain requirements are met. The choice of law provision must be executed in good faith. *Goodwin Bros. Leasing, Inc. v. H & B Inc.*, 597 S.W.2d 303, 306 (Tenn. 1980). The jurisdiction whose law is chosen must bear a material connection to the transaction. *Id*. The basis for the choice of another jurisdiction's law must be reasonable and not merely a sham or subterfuge. *Id*. Finally, the parties' choice of another jurisdiction's law must not be "contrary to ' a fundamental policy' of a state having [a] 'materially greater interest' and whose law would otherwise govern." *Id*, n.2 (citing Restatement (Second) of Conflict of Laws § 187(2) (1971)).

In a February 13, 1998, memorandum opinion relating

to this issue, the trial court made the following findings of fact: (1) both parties executed the agreement in good faith; (2) Tennessee had a direct and relevant connection with the transaction in question; (3) there was no evidence of sham or subterfuge; and (4) there was no evidence that Illinois had a materially greater interest.  The trial court also concluded, as a matter of law, that the provision was both a choice of law clause and a separability clause and that the parties intended to be governed by the laws of the State of Tennessee in the event a party sought enforcement of the contract in this state.  Based on this conclusion and its findings of fact, the trial court held that Tennessee law applied to the analysis of the covenant not to compete.

Cross argues on appeal that the trial court erred in applying Tennessee rather than Illinois law.  He contends that the provision is solely a separability provision because it provides for modification in the event that any portion is adjudicated invalid or unenforceable.  Additionally, Cross notes that the provision does not refer to a particular foreign jurisdiction, but rather refers to the laws of "each jurisdiction in which enforcement is sought."  In so doing, he argues, the provision does not promote the goal of certainty, predictability and uniformity because it necessarily mutates according to the jurisdiction in which Vantage seeks to enforce the agreement.  Vantage responds that the first

sentence of the provision is a choice of law clause and that ignoring it would amount to a finding that it is meaningless, a result that offends the established rule that contracts must be construed, as far as is reasonable, so as to give effect to every term.

We find that the trial court did not abuse its discretion in finding that the contract was executed in good faith, that Tennessee had a reasonable relation to the transaction, and that there was no evidence of improper purpose or that Illinois had a materially greater interest than Tennessee. Moreover, we agree that the provision is both a choice of law clause and a separability clause. To construe the first sentence of paragraph 2(b) of the agreement as anything other than a choice of law clause would be to ignore the clear intent of the parties and thus render the sentence meaningless. That the clause, in tandem with the separability clause, might result in a different outcome depending on the jurisdiction in which it is enforced is not an impediment to our decision. This is so because our exercise of jurisdiction over this matter is proper. Our decision is entitled to full faith and credit even though it affects the rights and obligations of the parties with respect to areas outside of Tennessee. Hence, as between Vantage and Mark Cross, the matter may not be re-litigated in another jurisdiction, and as such, the choice of law provision does not offend the goal of certainty, predictability and uniformity. We therefore hold

that the provision is a valid choice of law provision and that the trial court was correct in applying Tennessee, rather than Illinois, law.

## IV. *Conclusion*

The judgment of the trial court is reversed in part, affirmed in part and remanded for further determinations consistent with this opinion.  Exercising our discretion, we tax the costs on appeal half to each party.

_____
Charles D. Susano, Jr. J.

CONCUR:


_____
Houston M. Goddard, P.J.


___(Not Participating)___
William H. Inman, Sr.J.