IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 20, 2003 Session

## JAMES CORBIN v. TOM LANGE COMPANY, INC.

**Appeal from the Chancery Court for Davidson County**
**No. 01-532-III     Ellen Hobbs Lyle, Chancellor**

_____

**No. M2002-01162-COA-R3-CV - Filed December 1, 2003**

_____

This case involves a noncompetition agreement. An employee signed a noncompete agreement when he began working for an employer. The employee resigned and began working for a competitor of the employer. The employee sought a declaratory judgment that the noncompete agreement was unenforceable. Approximately eighteen months into the two-year noncompetition period, the trial court issued a ruling that the agreement was not enforceable. The employer appeals. We affirm, finding that neither the training provided to the employee nor the employee's relationship with the employer's customers created a business interest that warranted the protection of a noncompetition agreement.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Frank J. Scanlon, Nashville, Tennessee, for appellant, Tom Lange Company, Inc.

Kevin H. Sharp and Brad A. Lampley, Nashville, Tennessee, for appellee, James Corbin.

## OPINION

Plaintiff/Appellee James Corbin ("Corbin") began working for the Defendant/Appellant Tom Lange Company, Inc. ("Lange") in 1988. Lange is in the business of buying and selling produce. Near the beginning of his employment, Corbin entered into an employment noncompetition agreement ("Agreement") with Lange. The Agreement states:

> Noncompetition Agreement. During the Restriction Period defined below, Employee
> shall not, in connection with the conduct of any business substantially similar to the
> Produce Brokerage Business, contact, solicit business from, buy or sell produce to
> or from, or otherwise deal with any of the Essential Produce Customers or Essential
> Trucking Companies listed on Attachment A to this Agreement, or with any other

Essential Produce Customers or Essential Trucking Companies which the Company may add to said list from time to time by mailing written notice thereof to Employee at the Company's office in Nashville. . . .

. . . .

Definition of Restriction Period. The "Restriction Period" is the period beginning as of the effective date of the termination of Employee's employment under this Agreement and ending two years later.

Thus, the Agreement provided that, for a period of two years after his employment was terminated, Corbin could not contact clients designated as essential by Lange.

In July 2000, Lange updated the list of its essential clients, whom Corbin was restricted from contacting in the event his employment was terminated. The list included the names of five companies with whom Corbin conducted business for Lange. On September 26, 2000, Corbin resigned his employment with Lange. Although Corbin gave Lange sixty days' notice of his resignation, Lange terminated his employment immediately. Thus, the period of noncompetition specified in the Agreement began on the date Lange gave his notice, September 26, 2000, and would expire two years later, on September 26, 2002. Two days after his termination, Corbin began working for one of Lange's competitors.

Initially after Corbin left Lange, he abided by the terms of the Agreement, that is, he refrained from contacting any of the clients listed as essential by Lange. On February 16, 2001, Corbin filed a lawsuit against Lange seeking a declaratory judgment that the Agreement was not enforceable. Corbin asserted, *inter alia*, that the Agreement was unenforceable because his job responsibilities required only "general skills," and therefore Lange had no protectable business interest.[1]

Lange's answer asserted that Corbin's position at Lange required "expertise far above the 'general skills' of an average worker." Lange further contended that Corbin's expertise was acquired through the extensive training Lange provided to him. Discovery ensued.

The parties deposed Walter Lampertz ("Lampertz"), vice president of sales for Lange's Nashville division. In his deposition, Lampertz described the requirements for salespersons and the training Corbin received. In order to function effectively, Lampertz testified, a sales employee had to have a working knowledge of the Perishable Agricultural Commodities Act ("Federal Act"), the federal laws governing the produce industry, since Lange is licensed and regulated under the Federal

---

[1] Corbin also contended that a sufficient amount of time had passed for his "replacement to have established his [or her] identity with [Lange] customers such that there would be only ordinary competition between Corbin and [Lange]." In addition, Corbin claimed that a dispute existed as to the scope and enforceability of the Agreement; that Lange did not enforce similar covenants against other employees; that the Agreement was an unlawful restraint of trade; that the Agreement did not protect any legitimate business interest of Lange; that the Agreement was unreasonable; that the Agreement posed a financial hardship on Corbin; and that the agreement was contrary to public interest.

Act, and its license is affected by its compliance with the Federal Act. In addition, Lampertz testified, a sales employee had to be able to read produce and transportation markets, and had to know Lange's customers. The sales employee also had to be familiar with "growing seasons, planting and harvesting schedules, crop diseases, availability of harvest labor crews and weather patterns." He had to be knowledgeable about produce transportation, and be familiar with "fuel prices, availability of transportation equipment, weather conditions, [and] season of the year." Lampertz testified that Lange did not have a formal training program, but rather new sales employees learned these skills "by doing day-to-day business in tandem with me or someone in my office." Lampertz testified that when a new employee came to Lange, he received a "blue book," a widely available independent industry resource on the Federal Act. The "blue book" contained the names of produce vendors, purchasers, and shippers who were licensed under the Federal Act. Employees learned about the Federal Act by reading the "blue book" and through day-to-day business experience.

Most of Lange's business is conducted over the telephone. Lampertz testified that he coached new employees and helped them become accustomed to talking with vendors, suppliers, and shippers over the telephone. When the new employee became comfortable, the employee would begin making calls on his own. Lampertz sometimes listened in on the telephone conversations and offered advice to the employee if needed. All of the employees sat near each other in an open area. Each salesperson specialized in different categories of produce. Consequently, any given vendor, purchaser or shipper usually worked with more than one salesperson. In order to complete a sale, the salesperson would typically speak to a customer and then hand the telephone to the next salesperson, who then handed it to the next. Lampertz testified that the company had used this technique to build customer relationships and that Lange's relationship with its customers was vitally important.

When Corbin came to work at Lange, Lampertz gave Corbin coaching on his telephone skills. Lampertz said that Corbin received specialized training in asking the right questions to shippers and growers in order to properly read those markets. He said that Corbin was trained to ask questions regarding transportation in order to calculate the delivered price of produce for his customers.

In his deposition, Corbin acknowledged that Lampertz assisted him by giving him the "blue book." Corbin said that the "blue book" had thousands of listings, and that he chose from the listings whom he would call. Lampertz also listened in on Corbin's phone conversations with Lange customers and allowed Corbin to listen in on his own. Corbin said that during the second half of his first year of training, Lampertz did not listen to each of his telephone calls. Corbin explained that, on a typical day at Lange, he would "[c]all up various suppliers of fresh produce, determine availability, cost, and then formulate a plan to call potential buyers to attempt to sell them product." He agreed that a salesperson had to understand the transportation market and its fluctuating pricing, and be able to arrange the shipping of produce. Corbin said he learned this through on-the-job training as well as through Lampertz's assistance. Corbin acknowledged that a salesperson had to have a working knowledge of the Federal Act, and understand that as a licensee of the Federal Act, Lange as a company must adhere to the codes. Corbin said that it took him two to three years to

become proficient as a salesperson. He said that he dealt with approximately six customers on a daily basis. Corbin testified that abiding by the noncompete provision in the Agreement created an economic hardship and a burden, and had made it difficult, though not impossible, for him to make a living.

Lange and Corbin filed cross-motions for summary judgment. The parties' cross-motions centered on whether the training provided to Corbin by Lange, coupled with Corbin's relationships with Lange's customers, created a legitimate business interest which warranted the protection of a noncompetition agreement. Corbin argued that Lange's informal "on-the-job" method of training of "watching and doing" is not the type of specialized training entitled to protection. He maintained that Lange's training program is standard to the industry and that a person trained by Lange's competitors could work for Lange with no further instruction. In its pleadings, Lange, rather than focusing on the method of training, argued that the knowledge and skills required for working with the complex produce and trucking markets, along with the laws and regulations governing the industry, created a protectable business interest.

In regard to Corbin's relationships with Lange's customers, Corbin argued that because each Lange customer was routinely contacted by several Lange representatives, and Lange's corporate culture emphasized teamwork, and because so much time had passed from the time Corbin left Lange, there was no danger that Lange customers would identify Lange with him.[2] Lange argued that, regardless of the number of sales persons working with its customers, Corbin had in fact become the "face of the company." Lange noted that Corbin, as a Lange representative, contacted six to ten customers daily, some of whom he contacted on a weekly basis.

On April 16, 2002, after considering the cross motions for summary judgment, the trial judge found that Lange did not have a protectable business interest because Corbin "did not receive unique knowledge and skill through specialized training from [Lange]," nor did Corbin become the "face" of Lange to its customers. The trial court's comprehensive memorandum opinion cited *Vantage Technology, LLC v. Cross*, 17 S.W.3d 637 (Tenn. Ct. App. 1999), noting that, in order to enforce a noncompetition agreement, an employer must have a legitimate business interest to protect. *Vantage Technology*, 17 S.W.3d at 644. The employer has a legitimate business interest if, absent the noncompetition agreement, the employee would have an unfair competitive advantage over the employer. *Id.* In determining whether the employee would have an unfair advantage over the employer, the following factors are considered:

> (1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate

---

[2]Corbin also noted that he had not violated the agreement since he left Lange.

the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer.

*Id.* The trial judge noted that the only *Vantage* factors pertinent to the case at bar were whether Lange provided Corbin with specialized training, and whether Corbin's contacts with Lange's customers resulted in the customers associating Corbin with Lange.

The trial court found that "knowledge of the governing laws, ability to read the markets of produce and transportation and the ability to read the market on the price the customer is willing to pay" was "general information and skill which is obtained through experience in the industry." The trial court observed that other Lange salespeople also contacted Corbin's customers, and therefore, Corbin's customer contact was diluted. As a result, the trial court found, Corbin was "not so closely associated with the employer's business as to be the face of the company and have an unfair advantage in competition with the employer." Thus, the Agreement was unenforceable because Lange had no legitimate business interest to protect through a noncompete agreement.[3] The trial court granted Corbin's motion for summary judgment. From this order, Lange appeals.

On appeal, Lange argues that the trial court improperly granted summary judgment to Corbin because Lange has a business interest beyond normal competition, warranting the protection of a noncompetition agreement. A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04. Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). When only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

Corbin raises a threshold issue, namely, whether, given the fact that the two-year covenant not to compete expired on September 26, 2002, the issues raised in this appeal are now moot. In support of this argument, Corbin cites *CSJ Travel, Inc. v. Payne*, No. 03A01-9604-CH-00142, 1996 Tenn. App. LEXIS 509 (Tenn. Ct. App. Aug. 20, 1996) and *Crain v. Kesterson Food Co.*, No. 02A01-9302-CH-00041, 1994 Tenn. App. LEXIS 65 (Tenn. Ct. App. Feb. 16, 1994). Corbin acknowledges that, after the trial court issued its finding that the noncompete agreement was unenforceable, Corbin began contacting the protected "essential" customers. Lange responds that, since the trial court's decision was rendered before the expiration of the Agreement, if this Court finds that the Agreement is enforceable, Lange is entitled to seek damages for the period beginning

---

[3]The trial court found, however, that if Lange had a protectable legitimate business interest, the Agreement was reasonable, and therefore enforceable, because it was "narrowly tailored to cover only the five essential customers [that Corbin] dealt with regularly during his employment," and because the two-year time limit was reasonable under the circumstances.

at the date on which Corbin began contacting "essential" customers to the date of the expiration of the Agreement.

In *CSJ Travel, Inc. v. Payne*, the trial court enforced a noncompete agreement which prohibited the employee from soliciting customers of the employer after the employee's termination, by enjoining the employee from soliciting the customers. *CSJ Travel, Inc. v. Payne*, 1996 Tenn. App. LEXIS 509, at *3-4. The trial court, however, declined to enforce a provision of the noncompete agreement that prohibited the employee from working for a competitor of the employer. *Id.* at *4. This Court held that the trial court should have enforced the entire agreement. *Id.* at *6. Although the noncompete agreement had expired while the appeal was pending, the appellate court remanded the cause to the trial court for a determination of damages. *Id.* at *7. Thus, in a case in which a noncompetition agreement previously ruled unenforceable was on appeal found enforceable, the case was not moot even though the noncompete agreement had expired, because the employer could recover damages from the employee.

In *Crain v. Kesterson Food Co.*, the trial court refused to enjoin a former employee from competing against his former employer in violation of a noncompete agreement. *Crain*, 1994 Tenn. App. LEXIS 65, at *4. The appellate court found that the trial court erred in its denial of the injunction. *Id.* at *9-10. Although the noncompete agreement had expired, the employer asked the appellate court to nevertheless issue the injunction. *Id.* at *10. The appellate court refused the request, indicating that the injunction issue was moot because the employer could have applied for an interlocutory appeal or could have moved to finalize the order, but failed to do so. *Id.* Although the request for injunctive relief was denied, the appellate court noted that the employer could seek damages from the employee. The appellate court concluded, however, that there was insufficient proof of damages in the record. *Id.* at *10-11. Thus, as in *CSJ Travel*, although the noncompete agreement found on appeal to be enforceable had expired, the appellate court found that the employer could nevertheless seek damages from the employee, and thus the case was not moot.

In this case, Corbin did not contact prohibited customers until after the trial court had issued a final order finding the noncompete agreement unenforceable. Consequently, prior to the final order, Lange had no reason to file a counterclaim seeking damages. It is undisputed, however, that after the trial court issued its order, Corbin began contacting such customers. Therefore, under the *CSJ Travel* and *Crain* decisions, because the possibility exists that Lange is entitled to damages, the issue of whether the Agreement is enforceable is justiciable and not moot. Thus, we now address the enforceability of the noncompete provision.

Noncompetition agreements are generally disfavored in Tennessee as a restraint on trade. *See Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984) (citing *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 365 (Tenn. 1966)). They are not, however, *per se* unenforceable. Rather, they are to be construed in favor of the employee. *Id.* (citing *Allright Auto Parks*, 409 S.W.2d at 363, 365)). As noted by the trial court, in order to enforce the noncompete agreement, the employer must establish that it has a legitimate business interest that warrants the protection of a noncompetition agreement. *Vantage Technology, LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct.

-6-

App. 1999) (citing *Hasty*, 671 S.W.2d at 473).  If the employer has a protectable business interest, the court then continues its analysis of the reasonableness of the noncompetition agreement.  *See id.*

In order to establish a protectable business interest, the employer must show "special facts present over and above ordinary competition" such that the employee would have an unfair advantage over the employer absent the noncompetition agreement after his employment has ended. *Hasty*, 671 S.W.2d at 473 (citation omitted).  In determining if there would be such an unfair advantage, the court must consider (1) whether the employer provided specialized training, skill, or knowledge to the employee, (2) whether the employee was privy to business secrets and confidential information,[4] and (3) whether the employee had such repeated contact with the employer's customers that the customers would tend to see the employee as the "face" of the company.  *See id.*; *Vantage Technology*, 17 S.W.3d at 644.  These factors, individually or together, may give rise to a protectable business interest.  *Vantage Technology*, 17 S.W.3d at 644.  Here, Lange asserts that Corbin was given specialized training and that Corbin was the "face" of Lange to its customers.

As to training, after employment has ended, an employee may use his general skill and knowledge, either acquired during the course of employment or brought into the employment relationship, even if the employee acquired the knowledge and skill through expensive training. *Vantage Technology*, 17 S.W.3d at 644-45 (citing *Hasty*, 671 S.W.2d at 473 (Tenn. 1984)).  The employee's use of specialized or unique skill or knowledge acquired through special training may be restricted by a noncompetition agreement "at least when such training is present along with other factors tending to show a protectable interest."  *Id.* at 645; *Hasty*, 671 S.W.2d at 473 ("Training in conjunction with other factors has . . . been cited as a factor in upholding the reasonableness of a covenant.").  The court must draw a line " 'between the general skills and knowledge of the trade and information that is peculiar to the employer's business.' " *Selox, Inc. v. Ford*, 675 S.W.2d 474, 476 (Tenn. 1984) (quoting Restatement (Second) of Contracts § 188 cmt. g)).  They must determine "whether the skill acquired as a result of [the training the employee received] is sufficiently special as to make a competing use of it by the employee unfair."  *Vantage Technology*, 17 S.W.3d at 645.

Likewise, the employer may have a legitimate business interest warranting the protection of a noncompete agreement if the employee's repeated contacts with customers would cause the customers to tend to associate the employee with the employer.  *Vantage Technology*, 17 S.W.3d at 645.  In the customers' eyes, the employee must become the "face" of the employer.  *Id.*  The *Vantage Technology* court stated:

> This relationship is based on the employer's goodwill. . . . [As the employer's agent], the employee is made privy to certain information that is personal, if not technically confidential.  Because this relationship arises out of the employer's goodwill, the employer has a legitimate interest in keeping the employee from using this relationship, or the information that flows through it, for his own benefit.  This is

---

[4]Lange does not contend that Corbin was privy to business secrets or confidential information.

especially true if this special relationship exists along with the elements of confidential information and/or specialized training.

*Id.* at 645-46 (citations omitted). Thus, the employer may have a protectable interest in the relationship between the employee and its customers because that relationship is based on the employer's goodwill.

The enforceability of noncompete agreements has been addressed by Tennessee courts. In ***Hasty v. Rent-A-Driver, Inc.***, 671 S.W.2d 471 (Tenn. 1984), the employee was not privy to trade secrets or confidential information. *Id.* at 473. In order to establish a protectable business interest, the employer relied on the extensive screening done to hire drivers. *Id.* at 474. In its hiring process, the employer hired only ten out of every 100 applicants, and spent approximately four hours per applicant "weeding out" unwanted drivers. *Id.* at 473. After these employee drivers had gone through a ninety-day probationary period, the employer retained only three or four of the ten drivers. *Id.* at 473-74. The Tennessee Supreme Court found that the employer's expenditure of resources to identify and hire a qualified driver did not render the driver's subsequent competition unfair, because the employer had expended no resources to make the driver qualified. *Id.* at 474. Therefore, the noncompetition agreement was held unenforceable. *Id.*

The ***Hasty*** decision was cited in ***Selox, Inc. v. Ford***, 675 S.W.2d 474 (Tenn. 1984), as establishing that, in order to justify the protection of a noncompetition agreement, special facts over and above ordinary competition must exist such that, without the noncompetition agreement, the employee would gain an unfair advantage over the employer. *Id.* at 476. In ***Selox***, the employee had no sales experience prior to working for the employer. *Id.* at 475. The employee's training consisted of working on an existing sales route with another salesperson. *Id.* The employee later took over the route. His duties required him to contact existing and potential customers and sell them the employer's products. Prices were fixed by the employer or the manufacturer. *Id.*

The trial court found that the employee had acquired no trade secrets, and that the employer's customers could be ascertained by referring to a phone directory. *Id.* The trial court also found that the employee had received no specialized training and that "the particular work done by [the employee] for [the employer] could have been performed by any other employee of average competence." *Id.* The ***Selox*** court agreed with the trial court's conclusion that, under these circumstances, the hardship to the employee created by enforcing the agreement outweighed any benefit that the employer might receive. *Id.* Thus, the noncompete agreement was held unenforceable. *Id.* at 476.

A noncompete agreement was held enforceable in ***Vantage Technology, LLC v. Cross***, 17 S.W.3d 637 (Tenn. Ct. App. 1999), discussed in the trial court's memorandum opinion. In ***Vantage***, the employer hired technicians to transport portable eye surgery equipment. *Id.* at 641. The technicians set up the machines according to each physician's preferences, and assisted the physicians during surgery. *Id.* During the employee's first month of employment, he participated in 241.5 hours of training and observed approximately seventy surgeries. *Id.* at 646. He kept work

-8-

diaries in which he recorded the physicians' preferences. *Id.* at 641, 643. Customer relationships were based on the employer's goodwill. *Id.* at 646. The employee developed a relationship with a physician that eventually resulted in his departure from the employer. *Id.* at 643, 646. Under these circumstances, the appellate court held that the employer had a legitimate business interest which warranted the protection of a noncompetition agreement. *Id.* at 646

In this case, Lange contends that the Agreement is enforceable because Corbin received specialized training, and because he was the "face" of the company to its customers. Clearly, in his work as a salesperson, Corbin was required to understand the produce market and its fluctuations, the selling and pricing habits of vendors, and the purchasing habits of Lange's customers. In orchestrating the transportation of produce purchased from vendors, Lange had to be aware of the shipping market. Lange's "informal" training consisted of providing Corbin with a readily-available "blue book," and asking him to become familiar with the Federal Act, as set out in the "blue book." Corbin's phone conversations were frequently monitored for at least the first six months of his employment, and on a regular basis for the following 2-3 years. Lange coached Corbin about his conversations with customers, to train him to be a better salesperson for Lange, and he received "on-the-job" training on the produce and transportation markets. Obviously, after twelve years of employment, Corbin had acquired considerable knowledge of the produce market. However, based on the undisputed facts in this case, we find no error in the trial court's conclusion that Corbin did not receive specialized or unique training.

Lange also contends that Corbin's contact with Lange's customers was such that the customers saw him as the "face" of Lange, thus warranting the protection of a noncompete agreement. As noted above, at Lange each salesperson dealt with specific produce. The salesperson would speak with the customer and then pass the telephone to another salesperson specializing in other types of produce. The trial court found that this "tag-team" approach to customers diluted Corbin's contact with customers, so that each customer had relationships with multiple salespeople. Again, based on the undisputed facts, we find no error in the trial court's determination that Corbin's contact with customers was not such that Corbin became the "face" of Lange to its customers. Thus, we must agree with the trial court's conclusion that Lange did not have a business interest which warranted the protection of a noncompetition agreement, and that the noncompete agreement in this case is unenforceable. Accordingly, we find no error in the trial court's denial of Lange's motion for summary judgment and its grant of Corbin's motion for summary judgment.

The decision of the trial court is affirmed. Costs are taxed to the appellant, Tom Lange Company, Inc., and its surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE