**SMR TECHNOLOGIES, INC. and BE Aerospace, Inc. Plaintiffs,**

v.

**AIRCRAFT PARTS INTERNATIONAL COMBS, INC. Defendant.**

No. 00–2563.

United States District Court,
W.D. Tennessee,
Western Division.

April 13, 2001.

John I. Harris, III, Schulman Leroy & Bennett, P.C., Nashville, TN, Ashley N. Arnold, Schulman Leroy & Bennett, Nashville, TN, Douglas E. Jones, Law Offices of Douglas E. Jones, Nashville, TN, for SMR Technologies, Inc., plaintiff.

John I. Harris, III, Schulman Leroy & Bennett, P.C., Nashville, TN, Douglas E. Jones, Law Offices of Douglas E. Jones, Nashville, TN, James F. Kyle, Jr., Smith Sabbatini & McLeary, PLLC, Memphis, TN, for B.E. Aerospace, Inc., plaintiff.

James R. Newsom, III, Hanover Walsh Jalenak & Blair, Memphis, TN, Mike Roberts, Law Office of Mike Roberts, Memphis, TN, for Aircraft Parts International Combs, Inc., defendants.

James Allen, Memphis, TN, pro se.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

DONALD, District Judge.

Plaintiff, SMR Technologies, Inc. ("SMR") filed a motion for summary judgment in its breach of contract case against Defendant, Aerospace Products International, Inc. ("API"), formerly known as Aircraft Parts International Combs, Inc. The Court has jurisdiction over this case and controversy pursuant to 28 U.S.C. § 1332. For the following reasons, the Court grants SMR's motion for summary judgment and orders API to pay SMR $94,969.06, which includes $77,295.00 for unpaid merchandise and $17,674.06 in interest. The Court denies API's motion for mediation or arbitration.

## I. Background Facts

Plaintiff, SMR, is a corporation duly organized and existing under the laws of Ohio with its principal place of business in Fenwick, West Virginia. SMR is a wholly-owned subsidiary of B.E. Aerospace ("BEA"), a corporation duly organized and existing under the laws of Ohio with its principal place of business in Wellington, Florida. SMR and BEA are in the business of manufacturing, distributing, marketing, and selling aircraft parts, including pneumatic products, propeller products, pneumatic de-icers and components, and other aircraft parts. Defendant, API, is a corporation duly organized and existing under the laws of Delaware with its principal place of business in Memphis, Tennessee. API is a distributor of aircraft parts.

In 1997, SMR allegedly received approval from the Federal Aviation Administration ("FAA") to manufacture de-icing products for different types of aircraft. According to SMR, before this FAA approval, B.F. Goodrich was the only manufacturer of de-icing products in the general aviation market. (Pla. Statement of Undisputed Facts para. 2.) API was interested in entering the de-ice market and had allegedly attempted to become a distributor for B.F. Goodrich. (Pla. Statement of Undisputed Facts para. 4.) In early 1998, SMR and API began negotiations to allow API to become a worldwide distributor of the SMR de-ice product line. These negotiations led to a Distributor Agreement between SMR and API, signed on June 3, 1998.

Under the Distributor Agreement, SMR appointed API as the distributor for its ice shield pneumatic de-icers and components, and ice shield propeller de-icers and components. The parties negotiated and agreed to the following performance figures.

A. Distributor [API] will be required to maintain inventory and sell products during the term of the agreement as follows:

| Effective Date | Min. Inventory Level | Annual Sales Attainment at Distribution Cost |
| --- | --- | --- |
| July 1, 1998 | 125,000.00 | n/a |
| December 31, 1998 | 250,000.00 | 1,000,000.00 |
| December 31, 1999 | 500,000.00 | 4,000,000.00 |

According to the Distributor Agreement, SMR and API allegedly agreed that all invoices would be paid within thirty days and any invoices not timely paid would be subject to a late payment of one and one half percent per month, *i.e.* eighteen percent annually. Additionally, API agreed to collaborate with SMR to develop an annual market plan and forecast for products under the Distributor Agreement.

Pursuant to the Distributor Agreement, SMR provided API with aircraft parts from June 3, 1998 through February 1, 2000. API paid for the products that it received between June 3, 1998 and November 1, 1999, but allegedly failed to pay for the products it received from November 8,

1999 through February 1, 2000. (Complaint para. 10.) SMR contends that the balance owing, excluding interest and attorney's fees is $77,295.00. On April 18, 2000, SMR informed API that API was in material breach of the Distributor Agreement, and SMR made a demand for payment. (Complaint Ex. C.)

According to SMR, in the Fall of 1999, API allegedly reduced its efforts to promote actively and sell SMR products. By February 2000, API had entered into an agreement with B.F. Goodrich to distribute B.F. Goodrich's de-ice product line. (Pla.'s Statement of Undisputed Facts para. 16.)

SMR and BEA brought breach of contract claims against API.[1] Pursuant to Federal Rule of Civil Procedure 13(a), API filed a counterclaim against SMR and BEA. API alleged that before executing the Distributor Agreement, API and SMR made mutual mistakes concerning the scope and depth of the market for replacement de-icing and propeller products and their ability to capture a market share in the short period of time provided for in the agreement. (Schlesinger Affidavit para. 5; Arnett Affidavit para. 5.) API also alleges that SMR failed (1) to collaborate with API in developing an annual marketing plan and forecast for the territory and markets covered by the Distributor Agreement; (2) to provide API with sales litera-

ture, product specific literature, training material and other information; (3) to provide API with technical support and training to deal with customers; (4) to schedule dates for delivery of the products; (5) to provide a certificate of insurance for product and general liability insurance; (6) to achieve FAA certification for the number, type, and kind of de-icing products to be used on specific aircraft (thereby limiting the number of aircraft for which API could sell de-icing replacement products); and (7) to refrain from direct competition with the API sales force. (Def.'s Counter–Complaint paras. 7, 8; Schlesinger Affidavit para. 6(a)(1)-(4)). As a result, in May 2000, API terminated the Distributor Agreement.[2] API seeks $500,000.00 in damages against SMR for lost sales and profits, lost marketing costs, lost inventory carrying costs, consequential "and/or" incidental damages. (Def.'s Counter–Complaint, Prayer for Relief, para. 2.)

On October 16, 2000, API filed a motion to dismiss BEA's claim for lack of subject matter jurisdiction according to Federal Rule of Civil Procedure 12(b)(1). On December 27, 2000, the Court granted API's motion to dismiss BEA from the cause of action. On January 12, 2001, SMR filed a motion for summary judgment and submitted a statement of undisputed facts. API responded on March 5, 2001 with a memo-

---

1. BEA also sold aircraft parts and products to API, though it is not clear what agreement governed the dealings between BEA and API. BEA alleged that API failed to pay the $19,637.72 balance on its account.

2. SMR stated that API terminated the Distributor Agreement in May 2000, which API admitted in its "Opposition to Plaintiff SMR's Statement of Undisputed Facts." However, in an undated letter, (Golden Ex. 14), API stated that the termination was effective as of June 30, 2000. Additionally, in a separate letter, dated June 29, 2000, API gave notice of its termination. The Court ultimately relies

on both parties' assertions that API terminated the Distributor Agreement in May 2000.

As part of its June 29, 2000 letter, API offered to enter into settlement with SMR. API admitted to owing SMR $77,295.00 for SMR products. In response SMR denied that it had breached the Distributor Agreement in any way. Specifically, SMR mentioned meetings in May 1998 and July 1999, where SMR and API representatives met to collaborate on market plans and forecasts for products covered by the Distributor Agreement. (Golden Ex. 15.)

randum in opposition to SMR's motion for summary judgment and a motion for mediation or arbitration.

## II. Standard

█ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In other words, summary judgment is appropriately granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

█ The party moving for summary judgment may satisfy its initial burden of proving the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548. This in turn may be accomplished by submitting affirmative evidence negating an essential element of the nonmoving party's claim, or by attacking the opponent's evidence to show why it does not support a judgment for the nonmoving party. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2727, at 35 (2d ed. Supp. 1996).

█ Facts must be presented to the court for evaluation. *Kalamazoo River Study Group v. Rockwell Int'l Corp.,* 171 F.3d 1065, 1068 (6th Cir.1999). The court may consider any material that would be admissible or usable at trial. 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2721, at 40 (2d ed.1983). Although hearsay evidence may not be con-

sidered on a motion for summary judgment, *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 927 (6th Cir.1999), evidentiary materials presented to avoid summary judgment otherwise need not be in a form that would be admissible at trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Thaddeus–X v. Blatter,* 175 F.3d 378, 400 (6th Cir.1999).

█ In evaluating a motion for summary judgment, all the evidence and facts must be viewed in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Walborn v. Erie County Care Facility,* 150 F.3d 584, 588 (6th Cir.1998). Justifiable inferences based on facts are also to be drawn in favor of the nonmovant. *Kalamazoo River,* 171 F.3d at 1068.

█ Once a properly supported motion for summary judgment has been made, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348.

## III. Analysis

### A. Choice of Law

█ Regarding the choice of law in a contractual dispute, Tennessee follows the rule of *lex loci contractus. Vantage Tech.,*

*LLC v. Cross,* 17 S.W.3d 637, 650 (Tenn.Ct. App.1999). This rule holds that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent. *Id.* (citing *Ohio Cas. Ins. Co. v. Travelers Indem. Co.,* 493 S.W.2d 465, 467 (Tenn.1973)). If the contracting parties manifest an intent to apply the laws of another jurisdiction, then that intent will be honored if (1) the choice of law provision is executed in good faith; (2) the jurisdiction whose law is chosen bears a material connection to the transaction; (3) the basis for the choice of another jurisdiction's law is reasonable and not merely a sham or subterfuge; and (4) the parties' choice of another jurisdiction's law is not contrary to a fundamental policy of a state having a material greater interest and whose law would otherwise govern. *Id.; Goodwin Bros. Leasing, Inc. v. H & B Inc.,* 597 S.W.2d 303, 306 (Tenn.1980) (citing Restatement (Second) of Conflict of Laws § 187(2) (1971)).

In the instant case, the Distributor Agreement states, "All disputes, controversies, or differences which may arise between the parties, out of or in relation to or in connection with this Agreement, or the breach thereof, shall be finally settled under the Laws of the State of Delaware." (Distributor Agreement para. 10.) API is organized under the laws of Delaware; therefore, the choice of law bears a material connection to the transaction and is not merely a sham or subterfuge. Furthermore, the parties offer no evidence that the choice of law provision was not executed in good faith or that Tennessee has a greater interest in having its law applied rather than Delaware's. Therefore, the Court will honor the parties' choice of law and apply Delaware law.

**B. Uniform Commercial Code or Common Law**

■ Before engaging in further analysis, the Court must determine whether to apply Article Two of the Uniform Commercial Code ("U.C.C."), Del.Code Ann. tit. 6, §§ 2–101 to 2–725, or the common law. The U.C.C. governs contracts for the sale of goods, while the common law governs all other contracts. The U.C.C. and the common law are not always consistent, so applying one may yield different results from applying the other. In the instant case, the Court confronts a hybrid contract—one involving *both* the sale of goods and the provision of services.

■ Deciding whether to apply the U.C.C. or the common law, the majority of courts employ the "predominant purpose" test. *See, e.g., Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974); *Glover Sch. and Office Equip. Co. v. Dave Hall, Inc.,* 372 A.2d 221, 223 (Del.Super.1977). The predominant purpose test holds that if the predominant purpose of the transaction is a sale of goods, then the U.C.C. applies to the entire contract. *Novamedix, Ltd. v. NDM Acquisition Corp.,* 166 F.3d 1177, 1182 (Fed.Cir.1999). Conversely, when confronted with a hybrid case, a minority of courts apply the U.C.C. only to the "sale of goods" aspects of the given contractual dispute. James J. White & Robert S. Summers, *Uniform Commercial Code* § 1–1, at 4 (4th ed.1995) (citing *Foster v. Colorado Radio Corp.,* 381 F.2d 222 (10th Cir.1967)).

Although distribution agreements involve more than sales of goods, most jurisdictions find their predominant purpose to be the sale of goods. *See* Debra L. Goetz et al., *Article Two Warranties in Commercial Transactions: An Update,* 72 Cornell L.Rev. 1159, 1329 (1987). Therefore, the majority of courts treat distributor agreements as governed by Article Two of the U.C.C. *See, (e.g., Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129, 134

(5th Cir.1979); *Kirby v. Chrysler Corp.,* 554 F.Supp. 743, 749–50 (D.Md.1982)). *Contra Coca–Cola Bottling of Elizabethtown v. Coca–Cola Co.,* 696 F.Supp. 57, 84–85 (D.Del.1988). In *Wang Labs., Inc. v. Lee,* 1989 WL 40916 (Del.Super.Ct. Apr.19, 1989), the Delaware Superior Court held a distributorship agreement to be a U.C.C. contract, because the "thrust of the agreement" was the buying and reselling of computers. *Wang,* 1989 WL 40916, at *7. Similarly, in the instant case, the Court finds the sale of aircraft parts to be the "thrust" or "predominant purpose" of the Distributor Agreement. Therefore, Article Two of the U.C.C. governs the Distributor Agreement, but *not* exclusively.

The situation in *Wang* is very different from the instant case. *Wang* involved a statute of limitations issue, where the U.C.C. statute of limitations was four years and the non-U.C.C. statute of limitations was three years. Thus, in *Wang* there was a direct conflict between the U.C.C. and the non-U.C.C. Because of the direct conflict, the Court was forced to choose which statute of limitations applied. In the instant case, however, there are aspects of the Distributor Agreement that are not covered whatsoever by any provisions of the U.C.C. For instance, unlike SMR's claims, API's claims do not relate to the sale of goods but to SMR's concomitant duty to render services to API. Without guidance from non-U.C.C. law, the Court would be unable to analyze API's claims against SMR. Therefore, the Court will apply the U.C.C. where the U.C.C. governs, *but* the Court will look to non-U.C.C. law for guidance in those areas which the U.C.C. falls silent.

## C. Integrated Contract

■ The Court must first determine each parties' legal obligations under the contract and then determine whether any of these obligations where breached. Containing a merger clause, the Distributor Agreement is the central depository of both parties' legal obligations to one another. (Distributor Agreement para. 13.) Where the parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, the obligations under that written contract will not be varied by evidence of antecedent understandings or negotiations. Del. Code Ann. tit. 6, § 2–202(b); *Husband (P.J.O.) v. Wife (L.O.),* 418 A.2d 994, 996 (Del.1980); *Scott–Douglas Corp. v. Greyhound Corp.,* 304 A.2d 309, 315 (Del.Super.Ct.1973). Therefore, minus certain exceptions, *see* § 2–202(a), the Court will confine its analysis to the four corners of the Distributor Agreement.

## B. Defendant's Breach

■ The Distributor Agreement states that "all sales made by the Company [SMR] to the Distributor [API] shall be governed exclusively by the Company's terms and conditions of sale contained in Appendix D." (Distributor Agreement para. 6B.) According to Appendix D, API was to pay for products with U.S. dollars, net thirty days, and subject to a late payment charge of one and one half percent per month (eighteen percent annually). (Distributor Agreement, App. D.) In the event of a material breach of the Distributor Agreement not cured within sixty days of giving notice, the non-breaching party may terminate the Distributor Agreement. (Distributor Agreement para. 7(C).) Upon termination of the Distributor Agreement, API shall pay SMR, in full, all amounts owed to SMR. (Distributor Agreement para. E(4).)

SMR alleges that API failed to pay for the parts it received from November 8,

1999 through February 1, 2000.[3] (Complaint paras. 9, 10.) On April 18, 2000, SMR sent API a letter, memorializing this alleged material breach and demanding a cure within sixty days. According to the Court's calculations, this sixty-day period expired on approximately June 17, 2000.

Under § 2–607(1), the buyer must pay at the contract rate for any goods accepted. Failing to pay for goods accepted provides the seller with the right to cancel the contract and retain any remedy for breach of the whole contract or any unperformed balance. Del.Code Ann. tit. 6, §§ 2–106(4), 2–703(f). Before attempting to cure, API sent a letter to SMR in May 2000 terminating the Distributor Agreement.[4] Both API's failure to pay for the products and its termination of the Distributor Agreement without cause constitute material breaches for which API is liable.

### C. Plaintiff's Breach

Conversely, API argues that its termination was justified because SMR materially breached the Distributor Agreement. According to API, SMR failed (1) to collaborate with API in developing an annual marketing plan and forecast for the territory and markets covered by the Distributor Agreement; (2) to provide API with sales literature, product specific literature, training material and other information; (3) to provide API with technical support and training to deal with customers; (4) to schedule dates for delivery of the products; (5) to provide a certificate of insurance for product and general liability insurance; (6) to achieve FAA certification for the number, type, and kind of de-icing products to be used on specific aircraft (thereby limiting the number of aircraft for which API could sell de-icing replacement products); and (7) to refrain from direct competition with the API sales force. (Def.'s Counter–Complaint paras. 7, 8; Schlesinger Affidavit para. 6(a)(1)-(4)). For these alleged reasons, API terminated the Distributor Agreement. API attempts to rely upon the common law principle that the first party to commit a material breach of contract cannot complain if the other party subsequently refuses to perform. *Hudson v. D. & V. Mason Contractors, Inc.*, 252 A.2d 166, 170 (Del.Super.Ct.1969) (citing 17 Am.Jur.2d. Contracts, § 365). Nevertheless, API's decision to terminate the contract will prove to be a gamble "fraught with peril." *See Walker & Co. v. Harrison*, 347 Mich. 630, 81 N.W.2d 352, 355 (1957). When both parties have allegedly not fully performed, the Court must determine which party is chargeable with the first uncured *material* breach. *McClain v. Kimbrough Constr. Co., Inc.*, 806 S.W.2d 194, 199 (Tenn.Ct.App.1990) (citing Restatement (Second) of Contracts § 237 cmt b, (1979)). In the instant case, the Court finds API responsible for the first uncured material breach.

To determine whether a breach is material, the Court may consider the following factors: (1) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party

---

**3.** SMR does not offer evidence specifying the dates those invoices actually became due.

**4.** Although API does not deny that it sent a letter terminating the Distributor Agreement in May of 2000, API adds that it terminated *with cause.* (Def.'s Opposition to Pla.'s Statement of Undisputed Fact para. 18.)

failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. Restatement (Second) of Contracts § 241 at 237 (2d ed.1981). These factors form a loose and very flexible standard. A number of courts have developed a shorthand rule for determining whether or not a breach is material. These courts find a material breach to be one that "touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract." *Ervin Constr. Co. v. Van Orden,* 125 Idaho 695, 874 P.2d 506, 510 (1993).

### 1. SMR's Explicit Contractual Responsibilities

 The Distributor Agreement sets forth SMR's responsibilities as follows:

A. Company [SMR] shall, from time to time, provide Distributor [API] with sales literature, product specification literature, training material and such technical and other information, which, in the Company's judgment, may be helpful to Distributor in dealing with customers. Company will provide to Distributor technical support and training reasonably requested by Distributor in dealing with customers. The written materials which Company may furnish to Distributor shall, upon written request and upon the expiration or termination of this Agreement be returned to Company by Distributor....

B. Company shall provide Distributor with certificate of insurance for product and general liability insurance, ....

(Distributor Agreement paras. 5(A), 5(B)). According to the Distributor Agreement, SMR shall supply literature, product specification literature, training material, or other technical information only "from time to time," and only "which in Company's judgment, may be helpful." (Distributor Agreement para. 5(A)). SMR's affirmative duty to supply information is a weak one, as evidenced in the clause, "The written materials which Company *may* furnish to Distributor ..." (Distributor Agreement para. 5(B)) (emphasis added). The Court finds that SMR's alleged failure to supply API with literature, product specification literature, training material, or other technical information did not touch the fundamental purpose for the Distributor Agreement and therefore was not a material breach. API also argues that SMR breached the contract by failing to collaborate with SMR to develop an annual market plan and forecast of products. The Court finds that the Distributor Agreement delineates different responsibilities for SMR and API. Significantly, the duty to collaborate is not mentioned within SMR's list of "Responsibilities," but rather it is listed within API's list of "Responsibilities." Omitting the responsibility of collaborating from SMR's list of contractual duties, evidences an understanding that it is primarily an API responsibility. Therefore, the Court refuses to find SMR's alleged failure to collaborate a material breach. Likewise, the Court does not find SMR's alleged failure to provide API technical support and training a material breach. Any omission might constitute a breach, but to justify terminating a contract, a breach must be material, *i.e.* deprive a party of the benefit it reasonably believed it would receive under the contract and one that touches the fundamental purpose of the contract.

### 2. Parol Evidence

 After parties reduce an agreement to writing, neither party may introduce

evidence of earlier negotiations in an effort to show that the terms of the agreement are different from those terms embodied in the face of the writing. *Kirkwood Motors, Inc. v. Conomon,* No. 00A–05–001–PLA, 2001 WL 112054, at *2 (Del.Super. Feb.5, 2001) (citing Del.Code Ann. tit. 6, § 2–202) This principle, known as the parol evidence rule, bars a party from introducing extrinsic evidence to alter, modify, or contradict the terms of the writing. *Id.* (citations omitted). Nevertheless, there are limited exceptions to the parol evidence rule, including when the terms of the contract are ambiguous or to show that the agreement is invalid, void, or voidable because of fraud. *Id.* (citations omitted).

 API argues that SMR misrepresented its intentions to acquire FAA certification, thus leaving API with a limited number of products to sell. FAA certification might have been a fundamental assumption to the execution of the Distributor Agreement, and API claims that it was induced to enter into the agreement by fraud. Nevertheless, API continued to perform under the contract after it realized that the initial representations of FAA certification were false. Conduct, treating the contract as binding after full knowledge of a fraud is a waiver of the right to avoid the contract on that basis. *Tri State Mall Assocs. v. A.A.R. Realty Corp.,* 298 A.2d 368, 372 (Del.Ch.1972) Similarly, conduct, treating the contract as binding after full knowledge of a breach, is a waiver of the right to rescind the contract for the material breach. *See, e.g., Budge v. Post,* 544 F.Supp. 370, 383 (N.D.Tex.1982); *Schnepf v. Thomas L. McNamara, Inc.,* 354 Mich. 393, 93 N.W.2d 230, 232 (1958). Therefore, regarding any lack of FAA certification, the Court refuses to permit API to argue that it had a right to terminate because of fraud or breach. The Court

likewise disposes of API's claim that SMR's failure to provide API with a certificate of insurance for product and general liability insurance. Arguably aware of SMR's alleged failure to provide an insurance certificate, API continued to perform, thereby waiving its right to claim any such breach as a basis for termination.

 API argues that SMR sold directly to clients, in abrogation of the Distributor Agreement. Although the Distributor Agreement does not expressly state that SMR cannot sell directly to purchasers, API argues that the concept of "distributorship" means sole distributorship, excluding all competition including SMR. According to § 2–202, parol evidence can be used to explain a term of a contract by course of dealing, trade usage, or course of performance. Del.Code Ann. tit. 6, § 2–202. Whether or not "Distributorship" means sole distributorship, excluding the manufacturer from selling directly, could be proved by examining the course of dealing, trade usage, or course of performance. Nevertheless, much of API's evidence offered to support this claim is hearsay. For instance, Jerry Schlesinger's[5] statement that he "learned from comments made by API employees whom I [Schlesinger] supervise and other executives to whom I report and from executives of the Plaintiffs, SMR and BE Aerospace, Incorporated, and from customers of API, that SMR was engaging in direct competition with the field sales organization of API," is hearsay. (Schlesinger Affidavit para. 4.) Also, an e-mail from Greg Holder to Don Cox, dated December 7, 1999, indicated that Jeff Snyder, the Vice–President and General Manager of SMR, made it very clear that SMR would no longer sell direct. The Court found no evidence that any alleged direct selling

5. Jerry Schlesinger is president and chief executive officer of API.

occurred after this e-mail. Therefore, the Court concludes that any apparent breach was cured and does not constitute a basis for terminating the contract in May 2000.

### 3. Mutual Mistake

 Finally, API argues that the present case and controversy is a result of "all parties entering into an Agreement based upon mutual mistake." (Def.'s Memo. in Opposition at 11.) Specifically, API alleges that the parties entered into the Distributor Agreement with a misunderstanding of the scope and depth of the market for de-icing equipment and API's and SMR's ability to capture a market share in the short period of time provided for in the Agreement. (Def.'s Memo. in Opposition at 29.) Although API never instructs the Court for what reason it makes such an argument, the Court assumes it is API's attempt to avoid their contractual obligations. Regardless of the purpose for making such an argument, fluctuating market conditions and the changing financial situations of the parties do not justify the avoidance of contract obligations under the rules governing mistake. Restatement (Second) of Contracts § 152 cmt. b, at 386 (2d ed.1981). Although API may have demonstrated poor judgment in making the contract, the Court will not entertain any such arguments of mutual mistake. Restatement (Second) of Contracts § 151 illus. 2, at 384 (2d ed.1981). The Court allocates such risk to both contracting parties because it is reasonable for the parties to assume that they are mis-evaluating

their ability to succeed in a given market in a given time. Restatement (Second) of Contracts § 154 cmt. d, at 404 (2d ed.1981).

From the record, the Court infers an attempt by API to wriggle free of its contractual obligations with SMR so as to assume the B.F. Goodrich distributorship. Although SMR most likely did not fully comply with the Distributor Agreement, any omissions on its part did not rise to the level of a material breach, justifying API's termination of the agreement. Conversely, API's retaliatory termination becomes an actionable uncured material breach.

### IV. Remedies

 The Court orders API to pay SMR damages for the material breach of the Distributor Agreement. This award is not subject to any set-off, because paragraph F(1) of the Distributor Agreement specifically limits SMR's duty to repurchase to breaches committed by SMR.[6] Additionally, finding neither bad faith nor contractual or statutory authority supporting an award of litigation costs, the Court does not award SMR any attorney's fees. *See Ostrow v. Bonney Forge Corp,* No. Civ. A. 13270, 1994 WL 114807, at *13 (Del.Ch. April 6, 1994); *E.I. DuPont De Nemours and Co. v. Admiral Ins. Co.,* No. 89C–AU–99, 1994 WL 465547, at *6 (Del.Super. Aug.3, 1994).

---

6. The Distributor Agreement reads as follows:
 F. Upon termination of this agreement by *Company* [SMR], prior to December 31, 2001, for any reason:
 1. Company shall repurchase from Distributor [API] at Distributor's cost less a 15% restocking charge, any or all Products sold by the company to Distributor and not by the Distributor as of the date of termination.

 2. Any amounts owed by the Distributor to the Company shall be offset by any inventory returned to the company by Distributor for which Distributor shall retain such right for a period of sixty (60) days following termination.
 (Distributor Agreement paras. F(1), F(2)) (emphasis added).

The Court orders API to pay SMR damages of $94,969.06, which includes $77,295.00 for unpaid merchandise and $17,674.06 in interest.[7]

## V. Conclusion

For the reasons stated herein, the Court **GRANTS** SMR's motion for summary judgment and awards SMR $94,969.06 plus interest. The Court **DENIES** API's motion for mediation or arbitration.

7. Interest as calculated by the SMR as of February 1, 2001. API argues that it does not owe any amount and does not offer a different amount.