Melvin R. REDDING, Sr., Administrator of the Estate of Melvin R. Redding, Jr., and Marie Partlow Hogan, Individually as Sole Next of Kin of Richard Ben Partlow, II and as Administrator of the Estate of Richard Ben Partlow, II, Plaintiffs-Appellants,

v.

CONALLY FORD, INC., Defendant-Appellee.

Court of Appeals of Tennessee, Middle Section at Nashville.

Feb. 9, 1983.

Affirmed by Supreme Court Nov. 14, 1983.

James L. Bass and Ward DeWitt, Jr., Nashville, for plaintiffs-appellants.

H. Francis Stewart, Nashville, for defendant-appellee.

## OPINION

CONNER, Judge.

This is a wrongful death case arising out of a single vehicle accident involving multiple plaintiffs and consolidated for trial and appeal. At the conclusion of all the proof a verdict was directed for the defendant-appellee, Conally Ford, Inc.[1] Melvin R. Redding, Sr., administrator of the estate of Melvin R. Redding, Jr., and Marie Partlow Hogan, likewise the administrator of the estate of Richard Ben Partlow, II, appeal. An additional plaintiff at trial, William J. Brazil, Jr., does not.

The respective complaints alleged Randall W. Anderson to be guilty of negligence and that Conally Ford had done certain work upon the driving and steering mechanism of Anderson's vehicle; that the work done was faulty and certain looseness was present in said mechanism, permitting it to oversteer and improperly control the vehicle, proximately contributing to the deaths of plaintiffs' intestates and injury to the non-appealing plaintiff. Mr. Anderson was originally a party defendant, but after his discharge in bankruptcy, the plaintiffs voluntarily dismissed the suit against him.

The proof showed that the plaintiffs' intestates, as well as eight other persons, were the guests of Mr. Anderson in a 1975

---

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbreviated.

Ford pickup truck owned and driven by him on Sunday afternoon, October 22, 1978, for what might be characterized as a "joyride," and which, like so many others before, ended in tragedy. The parties at various times became passengers with Mr. Redding and Mr. Partlow joining the group as occupants in the rear of the truck in mid-afternoon. After all the parties were together, they journeyed on rural roads in northern Davidson County and Cheatham County, and in late afternoon were traveling in an eastwardly direction on Little Marrowbone Road in Davidson County; and as it approached the intersection of Little Marrowbone Road and Eaton's Creek Road, the truck failed to negotiate a curve, overturned and, as a result, Messrs. Redding and Partlow were fatally injured.

On that day the weather was good and the road dry. The accident occurred at approximately 4:45 p.m. and there was still daylight.

At the trial the plaintiffs introduced three witnesses who testified to matters material to this appeal.

Mr. Brazil was a passenger sitting in the rear of the pickup truck. He testified the parties had consumed a six pack and two quarts of beer which had been purchased in the early afternoon but that no one was drunk.

Concerning their travels he stated:

Q Was Randall Anderson driving all this time?

A Yes.

Q Was he causing you concern as far as his driving was concerned?

A No, he was not.

Q How was the truck behaving as far as the performance was concerned?

A It seemed all right at the time.

He testified regarding the accident:

Q Just describe to us then, if you would please, as you came up and had the wreck.

A Well, the only thing—the last thing I remember was that the vehicle went out of control and Randy Anderson was fighting the steering wheel.

Q Did you see that?

A Yes.

Q How could you see that?

A Well, I was sitting on the back—like here's the front of the truck (indicating), I was looking right at the man, at Randy.

Q How was he fighting the steering wheel?

A He was making that corner. It just looked like it went out of control. There wasn't no steering in it. It didn't matter if he was turning the steering wheel or not. It was just going.

Q Can you demonstrate?

A The truck was going to the left and he was trying to fight the wheel. He was trying to turn it back to the right.

Q What effect did that have?

A None. After it went back to the right he tried to fight it back to the left. There was no action on the steering.

Q Then what happened?

A We had that wreck.

Mr. Brazil also testified that Mr. Anderson had been drinking beer, had made a remark that he was drunk and at one time had suggested that he had been drinking and didn't want to drive.

Mr. Anderson testified the truck was bought used from Conally Ford on June 9, 1979, some 4½ months before the accident. Upon purchase no representations were made to him as to the condition of the truck.

He purchased a slave cylinder, a device for a 4 wheel drive vehicle to keep it from shimmying, from Conally Ford shortly thereafter. Mr. Anderson himself did the installation of this slave cylinder. He had had some previous employment with Royal Ford on the line, working on any vehicle that came in, and he considered himself a good enough mechanic to install a slave cylinder.

Approximately a month and a half after the truck was bought the front end "acted

silly on it; ... the power steering was squeaking and making noises." He took the vehicle to Conally Ford and talked to the shop foreman, who he could only identify as "Woody," telling him the front end was "acting funny" and that he wanted it checked. He testified this was done and that a man unidentified at trial worked on it for a while, drove it, came back, worked on it another time and drove it again. Mr. Anderson remained in the waiting room during this process but did watch the truck being jacked up, let down and driven. Mr. Anderson did not know what repairs were effected, made no payment for the work and never saw a work order for whatever may have been done. In the next few days he took the truck to Houston McQuistion, a mechanic, to look at the front end and make sure there was nothing wrong and to align the front end of the truck.

Mr. Anderson testified regarding the accident:

Q Just describe the wreck itself, please, sir.

A As I went into the curve at the road it was real rough. Since then they've paved it over. I must have hit a chuckhole and the steering wheel started wallowing. Evidently the steering wheel just locked and went flying in my hand and I couldn't get a hold to it.

Q Was it difficult to hold?

A I couldn't get a hold to it. It jerked out of my hand.

Q What about the movements of the truck as far as the road was concerned?

A We was going into a curve when I hit a chuckhole, or whatever it was, I guess, when it started doing that, plus the weight of the people in the truck and what we had in there, the steering wheel started shimmying all at once and it spinned around.

He estimated his speed at 35 miles an hour at the time of the accident and thought he had consumed approximately 3 cans of beer that day.

Edward Suddarth testified he was a mechanic for 35 years, had extensive experience in the maintenance and repair of trucks of the type that Mr. Anderson owned and that after the wreck, he examined the vehicle. His examination indicated that the actuator valve had been tampered with and it had not been put back together properly which would make the truck want to veer on a sharp turn or a quick turn or make it want to turn too much. He further explained that the actuator valve tells the truck when to give the power to turn right and when to give the power to turn left as it is pushed by the power steering gear. He testified that based upon the condition of the steering mechanism, in his opinion this could have been a contributing cause to the accident.

The defendant's witnesses' testimony is summarized as follows:

Larry Phelan testified he was a passenger in the truck sitting in the cab; that the parties purchased and drank some beer as they started on their trip which he described as a hayride. He further testified that when the accident occurred Mr. Anderson was going no faster than 40 miles per hour and that the truck hit a chuckhole in the road and went into a shimmy.

Charles E. Woods testified he was a shop foreman at Conally Ford in 1978. He did not know Mr. Anderson, nor did he recall the truck being brought to the shop that summer. Mr. Woods further explained that when a person takes a vehicle into Conally Ford to be repaired the custom before commencing work is to prepare a repair order. This is to show the various workmen what they are supposed to do. If there are any changes, these appear on the repair order, and the person can take that repair order and present it when he pays his bill. It affects the commission of the man who works on the vehicle. It is the only way he can become paid. The system is similar to that of other dealers.

An eyewitness, Fred Lewis Yates, Jr., testified that he was driving in a westerly

direction on Little Marrowbone Road and saw the accident. He had a feeling to stop, so he pulled off the road and did so. About that time Mr. Anderson's truck came into the curve and onto his side of the road. Then the driver cut back and headed back to the side the truck had formerly been on. When this happened, the truck turned up on 2 wheels and was heading toward a ditch. When the front wheel hit the ditch, the truck turned over. Mr. Yates believed the speed of the vehicle had to be pretty high in order to get it up on two wheels before it turned over. The truck did not turn over until it came completely back across the road and hit the ditch.

Roy Lane, a Metropolitan Nashville policeman, testified that he investigated the accident. Upon arrival at the scene there was no one in the truck. All of the occupants were scattered out on the road. The vehicle was on its top, facing northwest. The truck had left approximately 50 feet of skid marks. Officer Lane put on his report that there was defective steering but could not recall why and that it would have had to have been an assumption on his part at that time. He was assuming from what Mr. Anderson had told him that there were problems with the steering. It was an oversight on his part. The condition of the truck was such that it could not be examined.

A verdict was then directed for Conally Ford based upon the proof.

■ Before directing a verdict, it is the duty of the trial court to examine the entire record to determine if there is any evidence to support the verdict. In so doing the court must consider only the facts proved in support of the party against whom such motion is made; the court shall draw all reasonable inferences from supporting proof and disregard all countervailing evidence, and after doing this, if there is any competent evidence about which minds of reason could disagree, it is the duty of the trial court to overrule such a motion. *Jones*

*v. Zayre, Inc.*, 600 S.W.2d 730 (Tenn.App. 1980); *Crosslin v. Alsup*, 594 S.W.2d 379 (Tenn.1980); *City of Columbia v. C.F.W. Construction Co.*, 557 S.W.2d 734 (Tenn. 1977).

■ However, where there is no material and determinative evidence to support a verdict for the opponent of the motion for a directed verdict, the motion must be sustained. *Nicholas v. Provident Life & Accident Insurance Company*, 61 Tenn.App. 633, 457 S.W.2d 536 (1970); *Ridley v. Spence*, 61 Tenn.App. 571, 456 S.W.2d 846 (1970).

■ "Substantial Evidence" so as to justify submitting a case to the jury is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Nicholas v. Provident Life & Accident Insurance Company, supra.*

■ This court must also take the strongest legitimate view of the evidence in favor of the opponent of the motion, allowing all reasonable inferences in his favor. We must likewise disregard all countervailing evidence and deny the motion where there is any doubt as to conclusions to be drawn from all the evidence; a verdict should be directed only where a reasonable mind could draw but one conclusion. *Crosslin v. Alsup, supra; Goings v. Aetna Casualty & Surety Company*, 491 S.W.2d 847 (Tenn. App.1972).

Plaintiffs earnestly contend that there was sufficient evidence to allow the matter to go to the jury based in substance upon the testimony of Edward Suddarth, the properly qualified expert mechanic, that "tampering" on the actuator valve could have contributed to the accident, the testimony of Mr. Anderson regarding his visit to Conally Ford to have the front end of the vehicle checked, and his further testimony, corroborated by Mr. Brazil, that after striking the chuckhole in the curve the steering wheel "started wallowing," "locked," "went flying in my hand and I just couldn't get a hold to it."

■ We are simply unable to conclude that reasonable minds could possibly find liability based on this proof. First, assuming the absolute truth of Mr. Anderson's testimony, plaintiff's theory stretches the reasonable limits of credulity when one considers that 19 weeks went by after purchase of the used vehicle by Mr. Anderson and some 13 weeks passed after his purported visit to Conally Ford for the "free work" on the steering assembly of the truck without any evidence of steering malfunction.

Second, there is the testimony of plaintiffs' expert regarding causation. When asked if the activator valve that had been "tampered with" was a "contributing cause to the accident," Mr. Suddarth responded:

It *could* very well be. I don't know how the accident happened. It would have surely made the truck oversteer. (Emphasis supplied.)

Even plaintiffs' own expert was equivocal at best.

The uncontradicted proof from all the witnesses able to testify on the subject is that Mr. Anderson hit a chuckhole, or other road imperfection, a substantial lick. Was it more than any reasonable steering mechanism could be expected to take? Based on the state of this record we are unable to tell whether any properly constructed steering assembly should have been able to withstand the shock of whatever Mr. Anderson hit. There is no proof concerning the possibilities in that regard. Was it a big chuckhole or a little one? Was it 2 inches deep or a foot? Neither Mr. Suddarth nor any other witness testified as to exactly what Mr. Anderson hit or what sort of impact a vehicle of the type driven by Mr. Anderson should be able to withstand.

Moreover, and of critical significance in our judgment, there is absolutely no direct evidence in this record of any kind that anyone from Conally Ford ever touched the actuator valve before or after the sale to Mr. Anderson. True enough, though hotly disputed, we must accept as fact for purposes of a directed verdict ruling Mr. Anderson's testimony that some 13 weeks before the tragedy he took the truck to Conally Ford for repairs because the "front end" of the vehicle was making funny noises and not functioning properly. However, since even Mr. Anderson has no idea what repair work was done on the vehicle, or even by whom, since there was no record of the work and no billing therefor, it is impossible to determine if the actuator valve was actually even touched by anyone from Conally Ford. No witness testified at trial that in order to make repairs to the "front end of the truck" "squeaking and acting silly" that it was necessary or even probable that the actuator valve be inspected. Plaintiff attaches great emphasis to the testimony of Mr. Suddarth that there were plier marks on the actuator valve. We believe that emphasis is misplaced. In oral argument it was stressed that from this scarring an inference could be drawn by the jury that Conally Ford defectively attempted to repair the actuator valve. However, we cannot accept this contention. There is no testimony in this record as to whether the plier markings were recent or old, or any other proof that would connect them with the defendant. The truck was three years of age when the tragedy occurred. At any time after its manufacture and before this accident the marks could have been made. It is possible that they were made by a mechanic from Conally Ford 13 weeks before Mr. Anderson lost control of his vehicle just as plaintiffs' expert indicated it was possible that the allegedly defective actuator valve contributed to the accident. However, liability cannot rest on possibilities. Rather, there must at least be reasonable probabilities therefor.

Mr. Anderson himself testified that he worked on the slave cylinder, which also attaches to the steering mechanism. According to Mr. Woods, the former Conally Ford shop foreman, this device controlled shimmying. It is plausible to us that Mr. Anderson's involvement with the transmission might have contributed to the accident. Or the actuator valve could have been in a

defective condition prior to either Conally Ford or Mr. Anderson ever seeing this truck. Something could have happened on the visit to Houston McQuistion's or the chuckhole struck—but not described in this record—could have been so severe that no steering mechanism could be expected to withstand the impact. Why would the vehicle steer fine for 13 weeks after the visit and then suddenly malfunction from the defective work even if such could be proved? In our view the problem is that as to the actuator valve theory of liability there is simply not enough proof in this record from which any judge or jury could accurately ascertain which, if any, of the numerous possibilities to select. No judge likes to withdraw a dispute from a jury— especially one so serious as this. However, there are times when this must be done. We believe this is one of them. We think that reasonable men could infer that there *might* have been defective work involving the actuator valve by Conally Ford and that *might* have contributed to the accident. However, this is not enough. In our view there is insufficient evidence for a jury to infer that there *was* defective work on the actuator valve at Conally Ford and that it *did* contribute to the accident.

Accordingly, this cause is affirmed and remanded. The costs are taxed against plaintiffs.

AFFIRMED AND REMANDED.

LEWIS, J., concurs.

CANTRELL, J., dissents by separate opinion.

CANTRELL, Judge, dissenting.

I respectfully dissent from the majority opinion. Accepting the facts and the law stated by the majority, I think the case should have gone to the jury.

If we accept as true all the plaintiffs' evidence, take the strongest legitimate view of that evidence, and disregard all countervailing evidence, as we must under the au-

thorities cited by the majority, we find this situation: The front-end of the truck in which the decedents were riding had been worked on by the defendant Conally Ford some thirteen weeks prior to the accident; it appeared that the actuator valve had been tampered with, a fact that would make the truck "oversteer"; when the truck on the day of the accident hit a hole in the road it went out of control, veered sharply to the left and then back sharply to the right before hitting a ditch and overturning. I think that is enough to get to the jury on the question of the liability of Conally Ford.

It must be conceded that the plaintiffs' proof is weak and that there is an abundance of other proof in the record which casts doubt on their theory. However, the weighing of the countervailing evidence is for the jury. If, then, the trial judge in the role of thirteenth juror, is dissatisfied with the jury's verdict he or she can take appropriate action. But we must assume that the jury will, under proper instructions from the court and the persuasion of the advocates, rule correctly on questions of negligence and causation.

For these reasons, I dissent.