IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 16, 2006 Session

# INTERMODAL CARTAGE COMPANY, INC. v. TIMOTHY CHERRY, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 02-2651-II     Carol McCoy, Chancellor**

---

**No. M2005-01635-COA-R3-CV - Filed on March 28, 2007**

---

This case concerns an employment agreement entered into by employees of a company. The employment agreement contained provisions against solicitation and competition. Four employees who signed the agreement later left the company and went to work for one of its main competitors. The company leveled numerous allegations against the four employees and their new employer, including breach of the employment agreement, breach of duty of loyalty, unlawful inducement of breach of contract, and tortious interference with contractual relations and business relations. The trial court granted summary judgments in favor of the four employees and their new employer. The judgment of the trial court is reversed and the case remanded for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

James M. Simpson, Heather W. Fletcher, Memphis, Tennessee, for the appellant, Intermodal Cartage Company, Inc.

Fred Steltemier, Franklin, Tennessee, for the appellee, Timothy James Cherry.

Michael G. Derrick, R. Joseph Leibovich, for the appellee, Delta Depot/Delta Express, LLC.

Robert T. Vaughn, Nashville, Tennessee, for the appellee, Charles Pate.

John M. Cannon, Goodlettsville, Tennessee, for the appellees Dennis Etheridge and Gregory Zirock.

## OPINION

### I. FACTUAL BACKGROUND

Intermodal Cartage Company, Inc. ("Appellant" in this opinion, "IMC" in internal business documents and lower court proceedings) is a trucking company dealing in the highly competitive containerized cargo transportation business. Appellant has locations in several states, with two in Tennessee, located in Memphis and Nashville. Delta Depot/Delta Express, LLC ("Delta") is a direct competitor of Appellant, also dealing in the containerized cargo transportation business. As Appellant and Delta are direct competitors, they have several of the same customers, including Office Max, American President Lines ("APL"), and Yang Ming Lines ("Yang Ming"). Four of Appellant's previous employees are at issue in this case: Appellee Tim Cherry ("Cherry") was the regional Vice President, Appellees Dennis Etheridge ("Etheridge") and Charles Pate ("Pate") were dispatchers, and Appellee Gregory Zirock ("Zirock") was a customer service representative.

As employees of Appellant, Cherry, Etheridge, Pate, and Zirock all signed Employment Agreements. The Employment Agreements provided in relevant part as follows:

> 2. BEST EFFORTS OF EMPLOYEE: The Employee shall devote his or her full time and service to said employment and shall faithfully perform all duties normally incident to said employment or as otherwise directed by IMC. Employee shall not, during the term hereof, perform any services for, or be interested, directly or indirectly, in any manner, as a partner, officer, director, stockholder, advisor, consultant, employee or in any other capacity in any business similar to IMC's business, without first obtaining the written consent of IMC. Employee agrees to observe and conform to the policies and directions established by the management of IMC, and that all duties on behalf of IMC shall be performed in a manner consistent with all pertinent governmental laws, rules, and regulations, it being specifically understood that IMC does not condone any illegal activity whatsoever and that activity which contravenes any such law, rule or regulation is completely unauthorized by IMC and entirely outside the scope of Employee's employment.
> 3. CONFIDENTIAL AND PROPRIETARY INFORMATION: The Employee acknowledges that information pertaining to IMC's customers, drivers, owner-operators, rates, pricing, business procedures, patents, and other proprietary information constitute valuable and unique assets of IMC's business, and that the disclosure of this information to unauthorized persons would cause IMC irreparable harm. The Employee covenants that he or she will not, either during or at any time after the termination of Employee's employment with IMC, utilize any confidential or proprietary information, nor in any manner disclose, for any purpose, confidential or proprietary information to any person, business or other entity. Employee promises not to make or utilize copies of IMC's confidential and proprietary information except for the use and benefit of IMC and, upon termination of employment, Employee will promptly return all IMC documents and materials developed or obtained by Employee during employment by IMC. Information which is published outside IMC or otherwise publicly available is not considered confidential or proprietary.
> 4. NON-COMPETITION: The Employee will not, directly or indirectly, for a period of one year following Employee's resignation from employment or termination by

-2-

IMC for cause, solicit trucking, warehousing, storage, maintenance, equipment management, or other intermodal transportation services from

(1) the present customers of IMC; with the term "present customers" agreed to mean customers who have utilized IMC's services within a one year period preceding the termination of Employee's employment; or

(2) prospective customers to whom the Employee has directed written or verbal sales solicitations within a one year period preceding the termination of Employee's employment;

Employee acknowledges that the restrictions and obligations set forth and imposed herein will not prevent Employee from obtaining gainful employment in Employee's field of expertise or cause Employee undue hardship, and that the restrictions imposed herein are reasonable and necessary to protect the legitimate business interests of IMC.

5. NON-SOLICITATION OF EMPLOYEES OR OWNER-OPERATORS: Employee agrees that for a period of one year following the termination or expiration of this agreement, Employee will not, directly or indirectly, solicit for employment or other contractual arrangement, or otherwise encourage the departure of any employee working for IMC, or of any truck owner-operator who contracted with IMC during Employee's employment.

Cherry, Etheridge, Pate, and Zirock all received pay increases in consideration for signing their respective Employment Agreements.

The individual Appellee employees all resigned from Appellant within less than two weeks of each other. Cherry resigned employment from Appellant on August 7, 2002. Zirock resigned on August 12, Etheridge resigned on August 13, and Pate resigned on August 18. The specific details behind these resignations have become one of the main issues in this case. Of course, Appellant's account of the facts differ significantly from Appellees'.

Appellant alleges the facts as follows: When Cherry was its employee, his responsibilities included sales, operations, and office administration in the Nashville office. One of the main aspects of his position centered on customer relations: developing relationships with potential and existing customers by calling them on the phone, taking them to dinner and/or lunch, taking them to play golf, providing tickets to sporting events and concerts, etc. Because of these contacts, Cherry developed close and personal relationships with several of Appellant's customers, including APL, Office Max, and Yang Ming. Further, as a result of his position with Appellant, Cherry had knowledge of Appellant's confidential business matters, specifically, the identity of customers, the identity of drivers, business procedures, tariff and pricing structures, etc. Etheridge's main responsibility when employed by Appellant was dispatching owner-operator drivers, and he maintained good relationships with the drivers. Pate was the dispatch supervisor, and established good will with Appellant's customers. Zirock worked for Appellant as a customer service representative, maintaining extensive contact with Appellant's customers. One of his main job duties was to solicit business for Appellant. He also had knowledge of pricing structure and service methods.

Appellant alleges that in July of 2002, Lou Hazel ("Hazel"), the president and CEO of Delta, contacted Cherry to discuss employment opportunities with Delta, as the company was considering opening a terminal in Nashville. After the two met, Hazel also contacted Zirock, Etheridge, and Pate to discuss employment opportunities. All four of these employees of Appellant faxed copies of their Employment Agreements to Hazel. Following the initial contacts, Cherry, Etheridge, Pate, and Zirock began conducting closed door meetings, on Appellant's time and premises, several times a week. Cherry informed a coworker, Selena Hunt ("Hunt"), that he had offered jobs at Delta to Zirock, Etheridge, and Pate, and asked her if she would be interested in working for Delta.[1] If these allegations are true, such solicitation by Cherry would directly conflict with his Employment Agreement. On August 6, 2002, Cherry and Pate traveled to Jackson, Tennessee, to meet with Hazel. Shortly thereafter, all four employees resigned employment from Appellant.

Appellant alleges that immediately after the four began working for Delta, they also began taking steps to solicit Appellant's major customers and owner-operator drivers. For instance, while employed by Appellant, Cherry and Pate had established valuable good will with Office Max. After they were approached by Hazel, but before resigning from Appellant, Cherry and Pate visited Office Max's offices in Cleveland, Ohio. Also during this time, Hazel approached Kenny Spevak ("Spevak"), the Director of International Logistics for Office Max, in an attempt to persuade him to switch carriers from Appellant to Delta. Spevak told Hazel to assemble the people and drivers to handle the business; Office Max named Pate specifically as the individual working for Appellant who knew how to handle its business. Also, with respect to drivers, Spevak informed Hazel that as a condition of handling the Office Max account, Delta would have to hire Harold Hulsey ("Hulsey"), a driver for Appellant. Delta held a driver recruitment meeting on September 24, 2002. Cherry and Pate took part in the meeting. Also at the meeting were three of Appellant's drivers, including Hulsey. Hulsey testified that Pate contacted him directly to discuss employment opportunities at Delta, asking about other drivers for Appellant, and encouraging him to come to the recruitment meeting. Another recruitment meeting took place on October 7, 2002, which Etheridge and Pate attended. Following the Delta recruitment meetings, all three of Appellant's drivers who attended the meetings signed on to work for Delta. Hazel informed Spevak that the drivers were on board with Delta, and in October of 2002, Office Max transferred its business from Appellant to Delta. Appellant alleges that Delta, Etheridge, and Zirock continued to contact and recruit Appellant's drivers.

Appellant further alleges that Delta and Cherry took steps to encourage another of Appellant's major customers, APL, to switch its business to Delta. A few days before he resigned from Appellant, Cherry intentionally over booked capacity with APL so that APL's freight could not

---

[1] Hunt testified by affidavit as follows:

On Monday, August 5, 2002, Tim Cherry called me into his office. He told me he would not be in at work the next day; that he was taking a sick day and going to Jackson, Tennessee to meet with Delta Express. Tim Cherry told me he "had made job offers to Dennis (Etheridge), Charlie (Pate) and Greg (Zirock)" and asked if I would be interested. I responded "No, I don't think so." Tim Cherry told me he would "be taking Charlie (Pate) right away but that, because Delta Express was just getting started, it might be later before Dennis (Etheridge) and Greg (Zirock) came over."

be moved. Appellant had to pay a storage cost for storing the freight. Also regarding APL, Appellant alleges that it was outbid by Delta for certain transportation work, and that Cherry was somehow responsible for this, as he had access to Appellant's confidential business information. Further, as soon as Cherry began work for Delta, he contacted Monique Gainer ("Gainer") at APL to alert her of his employment change, telling her to call him if there was anything he could do for her. Also, Cherry and Delta executive John Green treated the two APL employees responsible for awarding APL business to companies to a golf outing. One of these employees testified that the golf outing had a customer relations purpose.[2] In late 2002, APL transferred a large portion of its business to Delta, costing Appellant its biggest account in Nashville.

Appellant alleges that due to Appellees' actions, it has suffered significant damages. First, it has lost business from large customers, including APL and Office Max. Second, Cherry, Etheridge, Pate, and Zirock, four of its key employees, resigned without notice and at approximately the same time. The resignations left Appellant's Nashville office in utter chaos, and Appellant was unable to properly service its customers. As a result, Appellant had to cancel large contracts with another lucrative customer. Much time and money was spent to interview and train replacements for the four employees so that Appellant would not have to close for business. Third, Appellant has lost good will with many of its customers, including APL, Office Max, and Yang Ming.

As noted above, Appellees' version of the facts differ significantly. Delta alleges that both APL and Yang Ming, who were long time customers of Delta, spoke to Delta on several occasions, dating back to 1999, about the possibility of Delta opening a Nashville location. Delta alleges that in 2002, APL approached it about opening an office because it was dissatisfied with the service it was receiving from Appellant. Delta further alleges that the Regional Supervisor with APL suggested that Hazel should contact Cherry, Etheridge, Pate, and Zirock about possible employment. Hazel testified that he contacted each of the four employees separately, and that none of the prospective employees ever discussed the employment opportunities with each other.

Regarding the solicitation of owner-operator drivers, Appellees contend that Hazel contacted those working for Appellant at the specific request of Spevak, and that Cherry, Etheridge, Pate, and Zirock had no involvement. Appellees further contend that at the recruitment meetings, Cherry, Etheridge, and Pate had only minor roles and merely assisted with the distribution, collection, and

---

[2] Joseph M. Gilpatrick, an APL employee, testified as follows:

Q: And would it be fair to say that since you have no personal relationship with Mr. Cherry outside of work, that the golf outing at The Hampton's golf club was related to your job as director of operations at APL?

A: That's fair to say. Probably I wouldn't have been invited had I not been the director of operations.

. . . .

Q: Would it be fair to say that the golf outing at The Hampton's had a customer relations purpose?

A: Yes.

copying of paperwork. Therefore, Appellees maintain that there was no active solicitation of Appellant's drivers on the part of Cherry, Etheridge, Pate, and Zirock. Appellees also contend that Cherry, Etheridge, Pate, and Zirock had no access to Appellant's confidential business information, and that they were no more privy to such information than any person reading the company's website would be.

All of the Appellees testified that Delta required each of them to acknowledge that he would be neither expected nor permitted to engage in any conduct on behalf of Delta that would violate any enforceable provision of his Employment Agreement with Appellant. Appellees argue that Cherry, Etheridge, Pate, and Zirock engaged in no conduct which violated their Employment Agreement with Appellant.

Appellant filed a Verified Complaint for Temporary Injunction, Permanent Injunction, and Damages against Appellee Cherry on September 5, 2002. On September 24, 2002, Appellant amended its complaint, adding Appellee Delta as a defendant. Appellant amended its complaint a second time on July 3, 2003, adding Appellees Etheridge, Pate, and Zirock as defendants. All Appellees filed answers to Appellant's complaint. In November of 2003, all five of the Appellees filed Motions For Summary Judgment.

Regarding Appellee Delta, on January 30, 2004, the trial court granted Delta's Motion for Summary Judgment, stating the following in its Order:

This matter having come before the Court for hearing on the Motion for Summary Judgment of Defendant, Delta Depot/Delta Express, LLC ("Delta"), on January 9, 2004. The Court, having considered the Motion for Summary Judgment; the undisputed material facts; the arguments of counsel both for and against the Motion; and, the entire record in this cause, finds:

Delta took no steps to cause or procure the breach of any contracts which may have existed between Intermodal Cartage Company ("IMC") and its employees or customers;

Delta did not interfere with any of IMC's contractual relations nor did it interfere with any of IMC's business relationships or prospective business relations;

IMC has no legitimate business interest which would warrant protection by the restrictive covenants placed in its employment agreements;

Neither Cherry, Pate, Etheridge or Zirock were privy to any confidential information of IMC while employed at IMC;

Neither Cherry, Pate, Etheridge or Zirock, individually or in the aggregate, enjoyed such a close relationship to any customers of IMC so as to constitute a special relationship or be seen as the face of the company;

Cherry did not violate any enforceable provision of his employment contract with IMC;

IMC did not incur any damages proximately caused by Pate, Etheridge or Zirock in obtaining employment with Delta before the expiration of the thirty (30) day period following their termination of employment from IMC;

IMC has failed to establish that it sustained any damages as a result of its alleged breach of the non-competition and non-solicitation provisions or the IMC employment contract;

therefore, the Motion is well taken and should be granted.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that Delta is entitled to judgment as a matter of law pursuant to Tenn. R. Civ. P. 56 as to all claims made against it by IMC in its Second Amended Verified Complaint, and, accordingly, Delta's Motion for Summary Judgment is hereby granted consistent with this Court's ruling of January 9, 2004.

Regarding Appellees Cherry, Etheridge, Pate, and Zirock, on February 2, 2004, the trial court issued four Orders granting their Motions For Summary Judgment. The Order issued in regard to Cherry appears below.

This matter having come before the Court for hearing on the Motion for Summary Judgment of Defendant, Timothy James Cherry, on January 9, 2004. The Court, having considered the Motion for Summary Judgment; the undisputed material facts; the arguments of counsel both for and against the Motion; and, the entire record in this cause, finds:

Intermodal Cartage Company ("IMC") has no legitimate business interest which would warrant protection by the restrictive covenants placed in its employment agreements;

That Cherry was not privy to any confidential information of IMC while employed at IMC;

Cherry did not enjoy such a close relationship to any customers of IMC so as to constitute a special relationship or to be seen as the face of the company;

The non-compete and non-solicitation provisions contained in the IMC employment contract are unenforceable;

Cherry did not violate any enforceable provision of his employment contract with IMC;

IMC has failed to establish that it sustained any damages as a result of its alleged breach of the non-competition and non-solicitation provisions of the IMC employment contract;

And, therefore, the Motion is well taken and should be granted.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that Cherry is entitled to judgment as a matter of law pursuant to Tenn. R. Civ. P. 56 as to all claims made against him by IMC in its Second Amended Verified Complaint, and, accordingly, Cherry's Motion for Summary Judgment is hereby granted consistent with this Court's ruling of January 9, 2004.

The Orders regarding Etheridge, Pate, and Zirock are the same as that of Cherry, above, save one provision. The provision that differs is as follows: in the Orders regarding Appellees Etheridge, Pate, and Zirock, the phrase "Cherry did not violate any enforceable provision of his employment contract with IMC;" is replaced with the phrase "IMC did not incur any damages proximately caused

by [Appellee] in his obtaining employment with Delta before the expiration of the thirty (30) day period following his termination of employment from IMC;".

Appellant presents numerous issues on appeal: (1) whether the trial court erred in granting summary judgment and dismissing Appellant's claims against Appellees Cherry, Etheridge, Pate, and Zirock for breach of the Non-Solicitation of Employees provision of their Employment Agreements with Appellant; (2) whether the trial court erred in granting summary judgment and dismissing Appellant's claim against Appellee Cherry for breach of the duty of loyalty; (3) whether the trial court erred in granting summary judgment and dismissing Appellant's claims against Appellees Cherry and Zirock for breach of the Non-Competition provisions of their Employee Agreements with Appellant; (4) whether the trial court erred in granting summary judgment and dismissing Appellant's claim against Appellee Delta for unlawful inducement of breach of contract, tortious interference with contractual relations, and tortious interference with business relations; and (5) whether the trial court erred in finding on summary judgment that Appellant failed to establish that it sustained any damages as a result of Appellees' actions in violation of the individual Employee Agreements and relevant law. Appellee Delta alleges that the appeal as to Delta is not properly before the Court, as Appellant failed to timely file its Motion to Alter or Amend Judgment.

## II. STANDARD OF REVIEW

According to Tennessee Rule of Civil Procedure 56, a party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The summary judgment standard, established by the Tennessee Supreme Court, is as follows:

> According to Rule 56.03, summary judgment is to be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." . . . In determining whether or not a genuine issue of material fact exists for purposes of summary judgment, . . . the trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. Then, if there is a dispute as to any material fact or any doubt as to the conclusions to be drawn from that fact, the motion must be denied. . . . At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]he issues that lie at the heart of evaluating a summary judgment motion are: (1) whether a factual dispute exists; (2) whether the disputed fact is material to the outcome of the case; and (3) whether the disputed fact creates a genuine issue for trial.

*Byrd v. Hall*, 847 S.W.2d 208, 210-214 (Tenn.1993) (citations omitted). "The standard of review of a trial court's grant of summary judgment is de novo with no presumption of correctness."

*Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn.2000).

### III. ANALYSIS

Appellant alleges that Appellee Cherry represented the face of Intermodal Cartage Company to its customers. Cherry spent large amounts of time, as well as large amounts of Appellant's money, developing personal relationships with key individuals at APL and Office Max, and therefore Appellant argues that it had a protectable business interest: specifically, preventing Cherry from using the valuable relationships and good will he developed with customers for his own, or his new employer's, benefit. Appellees Delta and Cherry argue that Cherry was in no way the face of the company, and that Appellant had no protectable business interest that would justify enforcement of the Employment Agreement.

This Court explored the protectable business interest and "face of the company" principles in the case of *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637 (Tenn.Ct.App.1999). Vantage, the employer, dealt in portable eye surgery machines, and hired and trained technicians to operate its machines. Good will was very important to Vantage's business, and the company encouraged its employees to maintain relationships with physicians they assisted. The employees had entertainment expense accounts to facilitate such relationships. Vantage also kept detailed records of physicians' surgical preferences and personal information, utilized to more effectively assist the physicians during procedures and encourage good will.

One of the technicians, Cross, terminated his employment with Vantage to work for a physician that he had assisted while employed by Vantage. Vantage filed suit to enforce the employment agreement that Cross had signed. A portion of this Court's analysis is helpful to the present issue at hand:

> [A] threshold question is whether the employer has a legitimate business interest, i.e., one that is properly protectable by a non-competition covenant. Several principles guide the determination of whether an employer has a business interest properly protectable by a non-competition covenant. Because an employer may not restrain ordinary competition, it must show the existence of special facts over and above ordinary competition. These facts must be such that without the covenant, the employee would gain an unfair advantage in future competition with the employer. Considerations in determining whether an employee would have such an unfair advantage include (1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer. These considerations may operate individually or in tandem to give rise to a properly protectable business interest.

*Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn.Ct.App.1999) (citations omitted). Specifically elaborating on the third consideration, an employee's repeated contacts with customers on behalf of an employer, this Court stated:

> It is often the case that the customer associates the employer's business with the employee due to the employee's repeated contacts with the customer. The employee in essence becomes "the face" of the employer. This relationship is based on the employer's goodwill. The employee's role in this relationship is merely that of the employer's agent. In this role, the employee is made privy to certain information that is personal, if not technically confidential. Because this relationship arises out of the employer's goodwill, the employer has a legitimate interest in keeping the employee from using this relationship, or the information that flows through it, for his own benefit.

*Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 645-646 (Tenn.Ct.App.1999).

> In making its decision, this Court stated that
> [T]he relationships between Vantage and the hospitals and surgeons were initiated by Vantage and were built on the foundation of Vantage's goodwill. Any contribution of Cross to the development and sustenance of these relationships was accomplished in Cross' role as an agent of Vantage. In performance of this role, Cross was made privy to surgeon preferences. He had a degree of knowledge of Vantage's other customers and the prices it charged for Cross' services. Additionally, it was in this role as Vantage technician that Cross' relationship with Dr. Gollamudi was initiated and developed. This relationship, as well as the information that flowed through it, gives Cross an unfair advantage in competition against his former employer because it comes at the expense of his former employer.

*Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 646 (Tenn.Ct.App.1999). In finding that Vantage had a legitimate business interest properly protectable by a covenant not to compete, this Court stated that, regarding the balance between enforcing and not enforcing non-compete provisions: "If the covenant is not enforced, Vantage stands to lose its . . . investment in developing customer relationships. . . . If the covenant is enforced, Cross merely loses that which does not belong to him." *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 647 (Tenn.Ct.App.1999).

While the findings of the trial court as to all Appellees and all of Appellant's claims might be unimpeachable after a trial on the merits, it is likewise clear that what the trial court refers to as "undisputed facts" are very much disputed facts based upon the credibility of witnesses, many of whom have an interest in the outcome of the case. Summary judgment cannot be used as a vehicle for determination of disputed facts or inferences to be drawn from disputed facts.

Shortly after the adoption of the Tennessee Rules of Civil Procedure, Justice Harbison observed:

In concluding this opinion we feel it proper to comment upon the procedure which was followed in the trial of this case. Summary judgment proceedings in this state were authorized for the first time by Rule 56 of the Tennessee Rules of Civil Procedure. This new procedure was designed to fill a vacancy or void which had existed in prior practice and to provide a procedural step which had heretofore not existed. Under previous practice, in both the circuit and chancery courts, there had been no satisfactory intermediate step between the demurrer, which dealt only with the contents of pleadings, and a full-scale trial of a case upon the merits. The summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. He is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues. In the present case, the Chancellor concluded immediately that there was a dispute by these parties as to whether there was or was not a total destruction of the building, an issue which he deemed material. Instead of overruling both parties' motions for summary judgment, however, he ordered a reference upon the disputed issue, and only after a lengthy reference had been completed, and exceptions thereto had been overruled, did he then purport to sustain the motion for summary judgment filed by the respondents. This is, to say the least, a very irregular use of Rule 56 proceedings. Unless the Rule is utilized only where clearly applicable and plainly within its designed purpose, its use may have the effect of preventing full and clear development of issues which could be accomplished by normal trial proceedings.

*EVCO Corp. v. Ross*, 528 S.W.2d 20, 24-25 (Tenn.1975).

The overruling of a summary judgment motion under the standard set forth in *EVCO* does not mean that a question for the finder of fact is necessarily presented, nor that a motion for a directed verdict in a trial on the merits may not be granted.

It has sometimes been stated in appellate opinions that if a motion for summary judgment is overruled, a jury question is presented. This is not strictly accurate. The overruling of a motion for summary judgment does not necessarily mean that the case will go to a jury at a trial, because the evidence adduced at trial may be significantly different from that contained in affidavits or depositions heard pre-trial on summary judgment proceedings. All that the overruling of a motion for summary judgment indicates is that the case should proceed further. *See Williamson County Broadcasting Co. v. Williamson County Bd. of Education*, 549 S.W.2d 371 (Tenn.1977). Whether it will ever go to a jury or whether it will be disposed of on directed verdict pursuant to Rule 50, T.R.C.P., depends upon the record developed at trial.

*Hamrick v. Spring City Motor Co.*, 708 S.W.2d 383, 388 (Tenn.1986).

The case at bar is essentially a swearing contest among people very much interested in the outcome of the case. Such testimony cannot form a predicate for granting either summary judgment or a directed verdict since even if such testimony is uncontradicted and unimpeached, the interest of the witness in the outcome of the case is sufficient to create an issue of fact. *Poole v. First Nat'l Bank of Smyrna*, 29 Tenn.App. 327, 196 S.W.2d 563 (Tenn.Ct.App.1946); *Morris v. Columbia Constr. Co., Inc.*, 109 S.W.3d 314 (Tenn.Ct.App.2003); *Anderson v. Mason*, 141 S.W.3d 634 (Tenn.Ct.App.2003).

This Court has held:

> Our courts have also equated motions for summary judgments pursuant to Tenn.R.Civ.P. 56 with motions for directed verdicts. *Bennett v. Mid-South Terminals Corp.*, 660 S.W.2d 799, 800 (Tenn.App.1983). Under state law, a directed verdict should not be granted if there is any doubt about the conclusions to be drawn from the evidence. *Sauls v. Evans*, 635 S.W.2d 377, 379 (Tenn.1982) and *Redding v. Conally Ford, Inc.*, 662 S.W.2d 938, 942 (Tenn.App.1983). Uncontradicted evidence will not entitle a party to a directed verdict, and by analogy to a summary judgment, when the credibility of the evidence has been called into question using one of the legal modes available to test the credibility of witnesses. *Curtis v. Kelsey Wheel Co.*, 168 Tenn. 262, 264, 77 S.W.2d 449, 449-50 (1935); *Standard Oil Co. of Louisiana v. Roach*, 19 Tenn.App. 661, 674, 94 S.W.2d 63, 71 (1936); and *Sprankle v. Meyernick*, 4 Tenn.Civ.App. 515, 520 (1913).

*Knapp v. Holiday Inns, Inc.*, 682 S.W.2d 936, 942-43 (Tenn.Ct.App.1984).

Several of the customers at issue testified as to their relationships with Appellant's employees. Spevak, Director of International Logistics at Office Max, testified as to the effect of Cherry's and Pate's resignations, stating that "...they had vanished from Intermodal Cartage, that on a Friday they worked there, and on a Monday they did not, and...that was extremely distressing to us." Monique Gainer of APL testified that she and Cherry had developed a close friendship:

> Q: Would it be fair to say that you and Mr. Cherry are social friends outside of work?
> A: Yes.
> Q: And so would it be fair to say that relationship developed while he was an employee at Intermodal Cartage?
> A: Yes.

Mark George, president and CEO of Appellant, testified as follows regarding the relationships that Appellant's former employees maintained with customers, and the effect of those relationships on Appellant's business:

Q: When you refer to valuable good will and patronage, does that mean that you have little or no customer complaints? How do you determine that you've got good will, valuable customer good will and patronage? How do you measure that?
A: By customer loyalty, the relationship between employee and client.
Q: Can you describe that customer loyalty between customer and client?
A: Well, the customer learns to have confidence and trust in the employees they're doing business with at your company and it becomes – they become somewhat like family to them where they feel like them giving your employee cargo and that employee servicing their business well has value to that employee, and has value to the company that they're doing business with. And its just a – it just fosters good will and continued patronage from our customers. They get a sense of loyalty to you.
Q: To the individual?
A: And the company they're doing business with
Q: Do you contend that Tim Cherry had established that type of loyalty with the customers he worked with?
. . . .
A: . . . Yes, he had earned valuable good will with APL, with Office Max, with Yang Ming Lines.
. . . .
Q: Is there anyone else at Intermodal Cartage that has established this customer loyalty or good will with APL, Office Max and Yang Ming Lines?
A: Yes.
Q: Who are those individuals?
A: Charlie Pate, Greg Zirock.

Significantly, Cherry's job responsibilities with Delta are very similar to the responsibilities he had while working for Appellant. While Cherry does not include sales in his own description of his responsibilities, his superior, Hazel, testified as follows:

Q: What are Mr. Cherry's responsibilities as vice president of the Nashville area?
A: Day-to-day management of the personnel there. To explore bringing new business in to Delta.
. . . .
Q: Within the Delta organization who has responsibility for soliciting new customers or soliciting more business from existing customers?
A: Myself; John Green; Tim Cherry, for new customers; Barb Brunswick in Atlanta.

The testimony makes it obvious that Cherry maintained fairly extensive relationships with customers. These relationships were maintained for the benefit and at the expense of Appellant. Therefore, the relationships between Cherry and Appellant's customers do not belong to Cherry; he was merely the device used by Appellant to establish good will with its customers.

One of the primary issues asserted by Appellant is that while he was still an employee of Intermodal Cartage, Cherry met with Hazel and thereafter, before resigning, he offered jobs at Delta to Etheridge, Pate and Zirock, also then employed at Appellant. Hazel met with Cherry for lunch in mid-July 2002, and, in his deposition, Hazel testified:

Q: . . . Tell me about the discussion you had with Mr. Cherry at that meeting.

A: We talked about whether or not he was interested. I let him know that it was likely that we would be doing a substantial amount of A.P.L. business. We generally talked about if he would be interested or not in looking further at coming on with Delta.

He did mention at that meeting that he did have an employement contract also and he was interested in looking further.

Q: And how did that meeting end?

A: With my asking him for a copy of that employment agreement and that we would talk further as time went on.

Q: When and how did you receive a copy of Mr. Cherry's employment agreement?

A: I believe he faxed it to me the next day. He may have mailed it but I'm pretty sure he faxed it to me.

Q: Do you know approximately when or what part of the month of July you had this meeting with Mr. cherry at the Picadilly?

A: Mid July.

. . . .

Q: What was the next thing that happened leading to Mr. Cherry's employment with Delta; the thing that happened after he faxed or mailed you a copy of his employment agreement?

A: I spoke with Mr. Derrick concerning the employment agreement, I gave him a copy of it and asked him about employment agreements, the validity of what it was -- of what that employment agreement was.

Q: And following your discussion with Mr. Derrick what action did you take concerning Mr. Cherry's possible employment with Delta?

A: I had several conversations with Tim over the phone, just trying to move closer to figuring out a way of hiring Tim.

Q: What were the major issues that stood between you and Mr. Cherry coming to work for Delta? What did you all have to talk about? Was it money? Was it a relocation package? Was it bonus, or what?

A: I think it was more of Tim being willing to leave Intermodal Cartage. It wasn't money because we really didn't discuss that for some time. I knew about what he was making, he told me that. It was more him making up his mind.

Q: So you recall that Mr. Cherry had some reservations about whether or not he should leave Intermodal; is that correct?

A: Yes.

Q: And so what did you say with respect to Cherry to encourage him to join Delta? Did you paint a brighter future or -- what did you do to kind of use a little salesmanship to help him make up his mind?
A: I really didn't. I just answered any questions he might have about Delta and, you know, it was more his discomfort or unhappiness with his work environment that he was in than my salesmanship.

Hazel denied that he talked to Cherry about hiring Etheridge, Pate and Zirock for Delta.

Selena Hunt testified by deposition that she started with Intermodal Cartage in the year 2000 and later, in Nashville, as a customer service specialist. She testified regarding the hiring by Delta of Cherry, Etheridge, Pate and Zirock during the period of August 5, 2002, when Cherry told her he was meeting the following day with representatives of Delta, and August 8, 2002, which was Cherry's last day with Appellant.

Q: And that was the only time he ever called you at Intermodal after he left? Your next statement down there, I'm trying to figure out: "he has only tried calling me one time after his departure with Intermodal."
A: That was the only time.
Q: So what that's saying is that's the only time you've talked to Tim since he left?
A: Yes.
Q: No, the next little paragraph, it says, "Prior to Tim's departure there were many meetings in Tim's office with Greg, Charlie, and Dennis."
Are those the closed-door meetings you were telling me about a moment ago --
A: Yes.
Q: Where did you -- you didn't know what was discussed, you just knew they were in there?
A: Right.
Q: Now, the bottom paragraph, Randy told you to write that, didn't he?
A: No.
Q: Tell me what you know about that.
A: Tim had proposed jobs to Dennis, Greg, and Charlie. They wouldn't have known about the job if it hadn't been for Tim.
Q: You made that assumption?
A: Right.
Q: Nobody --
A: That they would have -- right, yes.
Q: I just want to find out where you got that knowledge.
Nobody told you that Tim had offered them jobs?
A: Yes.
Q: Who told you that?
A: Tim.
Q: When?
A: I don't know -- prior, before him leaving, the first week in August.

Q: I'm a little confused. Tim had offered them jobs at Delta? I'm a little confused how he could do that when he was working for Intermodal.
. . . .
A: I know he offered them a job.
Q: Okay. And now I want to ask you know you know that?
A: He told me.
Q: When did he tell you?
A: August, I don't know a date.
Q: Was it after Tim left?
A: No, it was before.
Q: Where were you when he told you this?
A: In his office.
Q: Tell me the context of the conversation. I'm still confused about it.
A: Tim and I were kind of close at work. We talked about a lot of things and he would tell me how he felt and stuff. And he said that he was going to offer Dennis, Charlie, and Greg a position at Delta. And that he even said that if he took the job that Charlie would go first and that Dennis and Greg would come shortly after, that he didn't know that they were going to take the job, he didn't know if they were going to go, but he was going to propose it to them.
Q: So he had not proposed it to them when he told you?
A: Well, yes. Yes, because this was when all the closed-door meetings were taking place.
Q: But did he tell you in those closed-door meetings, "I proposed jobs to them"? Or is that something that you're now kind of speculating or filling in the gaps?
A: No, he told me that he had offered them jobs.
Q: He had offered them jobs?
A: Yes.
Q: And what did you say in response to that?
A: What could I say?

All of these witnesses have an interest in the outcome of the case. Cherry has a direct interest, while Hazel and Hunt have a derivative interest in the fact that they are employees of corporate parties to the litigation. *See Knapp*, 682 S.W.2d at 943.

In its Response to the Statement of Undisputed Material Facts filed by Appellant, Appellee Delta says:

> 4. As Regional Vice-President for Intermodal, Tim Cherry had responsibility for sales, operations and administration. (Dep. of T. Cherry, pg. 29; (Dep. of R. Wrigth [sic], pg 53) In this capacity, Mr. Cherry had frequent involvement with some [of] Intermodal's most valued customers and would visit certain out of town customers on at least a yearly basis.
> **RESPONSE:** Undisputed for purposes of Motion for Summary Judgment.

-16-

5.      Starting July 2002 and up until Tim Cherry left IMC August 8, 2002, Cherry held "closed door" meetings with only Pate, Etheridge and Zirock in attendance.  These "Closed door" meetings between Cherry, Etheridge, Pate and Zirock occurred two or three times a week.  (Affidavit of S. Hunt) In at least one of the "closed door" meetings between Cherry, Ehteridge, Page [sic] and Zirock, Cherry told the others that he wasn't happy (working at Intermodal) and was thinking about leaving the company.  (Dep. of G. Zirock, pag 33)

**RESPONSE:** Undisputed for purposes of Motion for Summary Judgment.

6.      On August 5, 2002, Tim Cherry called Selena Hunt into his office.  (Affidavit of Selena Hunt, pg 1; Deposition of Selena Hunt pgs. 80-83, 88, 91, 135; Dep. of T. Cherry pg 74)  Cherry told Ms. Hunt he had made job offers to Dennis (Etheridge), Charlie (Pate) and Greg (Zirock), for them to go to work for Delta.  (Affidavit of Selena Hunt, pg 1; Deposition of Selena Hunt pgs. 80-83, 88, 91, 135; Dep. of R. Wright, pgs. 123-125)

**RESPONSE:** Disputed.  Hunt knew that Cherry did not work for Delta and that the comments were sarcastic and joking.  (Dep. of Hunt, p. 76-77).

7.      On August 5, 2002, Tim Cherry told Selena Hunt that he "would be taking Charlie (Pate) right away but that, because Delta Express was just getting started, it might be later before Dennis (Etheridge) and Greg (Zirock) came over."  (Affidavit of S. Hunt, pg. 1; Dep. of S. Hunt, pgs. 136-137)

**RESPONSE:** Disputed.  Hunt knew that Cherry did not work for Delta and that the comments were sarcastic and joking.  (Dep. of Hunt, p. 76-77).

So we have it undisputed that "closed-door meetings" occurred between Cherry, Pate, Etheridge and Zirock from July 22, 2002, up until the departure of Cherry from Intermodal on August 8, 2002.  Then, as to the alleged job offers to Etheridge, Pate and Zirock made by Cherry to which Hunt testifies, we have meaningless responses.  Obviously, Cherry did not work for Delta at that time, and nobody has said otherwise.  The factual point always has been that Cherry made such offers of employment to Etheridge, Pate and Zirock while still employed with Intermodal but subsequent to his discussions with Hazel relative to future employment by Delta.

Disputed issues of fact permeate this case, and summary judgment is improper.

## IV. Conclusion

The record in this case presents issues to be determined by a trier of fact, not the trier of law.  The third element of unfair advantage established by this Court in *Vantage*, standing alone, is enough to avoid summary judgment when applied to the facts in this record.  Regarding the four Appellee employees, there are issues of fact about whether they solicited truck drivers, whether Cherry solicited the other three for Delta, and whether they solicited Appellant's customers.  There are issues of fact regarding whether Cherry breached his duty of loyalty to Appellant.  There are issues of fact regarding whether Delta induced Appellant's four employees to breach their Employment

Agreements, or interfered with Appellant's relationships with its employees. The breach of duty of loyalty claim against Cherry survives summary judgment. The judgment of the trial court is reversed and the case remanded for further proceedings. Costs of appeal are assessed to Appellees.

_____
WILLIAM B. CAIN, JUDGE